HOLLY (UNITED STATES v.). See Case No. 15,381.

———

# Case No. 6,625.

HOLLYDAY v. The DAVID REEVES.

KEENE v. The DAVID REEVES.

[5 Hughes, 89.]

District Court, D. Maryland. Oct. 29, 1879.

DEATH BY WRONGFUL ACT—ADMIRALTY JURISDICTION—DAMAGES—FRIGHT AND MENTAL SUFFERING—COLLISION—WANT OF LOOKOUT.

[1. Damages are recoverable by a libel in rem in admiralty, for the wrongful death of a person, independent of statutory remedy.]

[Cited in The Manhasset, 18 Fed. 925; The Harrisburg, 119 U. S. 208, 7 Sup. Ct. 144.]

[But see note to Case No. 541.]

[2. In computing damages for a wrongful death, only the pecuniary loss is to be considered; nothing is to be allowed by way of punishment, or for the sufferings of the deceased, or for the bereavement of his relatives.]

[3. In the case of a minor son eighteen and a half years old, whose earnings amounted to less than the cost of maintaining him, the court considered the contingencies of his future earnings, and his contribution to the support of his widowed mother, etc., and the expense of recovering and interring his body, and allowed her $700 as compensation.]

[4. No damages are given for fright or mental suffering resulting from mere risk or peril, where no actual injury has been sustained; nor for the results of mental or nervous disturbance, where no bodily harm is sustained.]

[5. A collision occurred on the Chesapeake Bay, just off the mouth of the Chester river, between a steamer which had just come out of the river and a sailing yacht intending to enter the river, shortly after the yacht passed under the stern of a tow. The steamer was in charge of a captain and mate, both of whom were in the pilot house, and were strangers to the river and bay, and was without a lookout. The deviation in the course of the yacht, as she passed under the stern of the tow, was so slight as not to alter her lights to the steamer. The inboard screens of her side lights were not of the length required by law, but the lights were burning brightly, and were not discovered at all on the steamer until immediately before the collision. *Held*, that the steamer was solely at fault.]

In admiralty.

MORRIS, District Judge. These cases arise out of a collision between the steamer David Reeves and the sailing yacht Curlew, and were by agreement of counsel heard together, and upon the same testimony. The collision occurred on the Chesapeake Bay just off the mouth of the Chester river, near Love Point light, about 10 o'clock on the night of the 11th of August, 1879. The yacht was intending to enter the river, having come up the bay from Oxford. The steamer had just come out of the river, and was on her way to Baltimore. There was a steam tug, the Grace Titus, with a barge in tow, two or three hundred yards nearly straight ahead of the steamer, and the yacht, having passed under the stern of the barge and across her course, soon afterwards came into collision with the steamer. The mate of the steamer, who was at the wheel in the pilot house, saw the yacht just before the collision, and had her engine stopped and reversed, and ported his helm so that the force of the blow was not great; and the only direct and immediate consequence of the collision was a slight damage to the hull of the yacht, which was subsequently repaired.

With regard to the primary question, which of the two vessels is to be held responsible for the collision, I have no difficulty. The testimony of the persons on board the yacht, corroborated as it is entirely by the captain and mate of the Grace Titus and by the captain of the schooner Gerkin, has satisfied me that the lights of the yacht were proper and plainly to be seen, and that she held her course. The admissions of the claimants of the steamer and the testimony of their witnesses show conclusively that she had no look-out, and that the only persons on her deck giving any attention to her navigation were her captain and mate, both of them in the pilot house, both of them strangers to the bay and river, the mate indeed on his very first trip down the river. This too at a time when the attention of those steering the steamer was particularly occupied in taking their vessel by a short cut over shoal water between the upper end of Kent island and the light house, very considerably south of the actual river channel. It is useless to go into the details of the testimony, as under such circumstances, and coming out of the river where they were very likely to meet vessels, the absence of a competent and vig-

ilant look-out actually attending to his duties was a fault of the grossest character.

I find nothing in the testimony that satisfies me that the yacht by any fault or omission contributed to bring about the collision. The deviation in her course as she passed under the stern of the barge was so slight that it was not observed at all by those on board the Grace Titus, and the whole testimony satisfies me that it was not sufficient to have altered her lights to the steamer. With regard to the allegation that the side lights of the yacht could be seen across her bow, the weight of the testimony is that they could not be so seen, but that they were properly arranged. It is true that the inboard screens of her side lights were only sixteen inches long instead of three feet, as required by the Revised Statutes, and this would be a most serious fault if there was evidence to satisfy me. that the steamer could possibly have been misled by the lights of the yacht, but the weight of the testimony to my mind proves that neither the captain nor the mate of the steamer ever saw the lights of the yacht at all until they saw her green light just under the steamer's bow. The only effect of the shortening of the screens, if it did have any effect, would have been to show both lights when only one should be visible, as the proof is that both lights were shining brightly. How then could the want of proper screens have possibly misled the steamer when, as I think, the proof shows they never saw either? The dim red light which they speak of having seen could not, I think, have been on the yacht at all, and it seems very probable that it was the port light of the Gerkin.

I must therefore find the steamer to have been in fault and alone responsible for the consequences of the collision. The first of these consequences was the injury to the yacht which was repaired at an expense of $79.61. The really important claims, however, for which these libels are filed grow out of other consequences which resulted from the collision, viz., (1) the death of young Newton Keene who, being precipitated overboard by the careening of the yacht under the force of the blow, was in the darkness of the night most unfortunately lost overboard and drowned; (2) the claim of Mr. Clarence Hollyday, who alleges that by reason of the nervous strain consequent upon his yacht being run down in the dark and the sad death of his young companion, who was his guest on board, he has been unnerved and unfitted for business and greatly disturbed in his health, sleep, and power to apply himself to any settled employment. Both these claims give rise to questions of importance.

With regard to Mr. Hollyday's claim; it appears by the testimony that he was not scratched or hurt by the collision, and the only result to his body that he was sensible of was that for some days afterwards he felt sore and stiff in his limbs, but he has been going about as usual ever since. A witness, however, with whom he is connected in business, testified that since the collision (a period of about seven weeks) he had not given as efficient attention to his duties as previously, but no data were given and probably none could be given in such a case upon which to base any estimate of pecuniary loss. From the authorities I have consulted I think that in such cases as this the proper rule is to give no damages for fright or mental suffering resulting from mere risk or peril where no actual injury has been sustained. Such cases are damnum absque injuria. The case of Chamberlin v. Chandler [Case No. 2,575], referred to by counsel as indicating the proper measure of damages, was referable to a very different ground. It was a case of a female passenger who experienced great mental suffering by reason of the wantonly harsh and indecent conduct of the master of the vessel, his acts indeed amounting to an assault, but in that case the accepting of the passage money raised an implied contract that the passenger while on board should be protected from such treatment. In no case similar to the one under consideration have I been able to find that damages have been allowed for the results of mental or nervous disturbance, where there has been no bodily harm sustained, and it seems to me that to hold otherwise would be to let in a class of claims, incalculable in numbers, which neither court nor jury could possibly estimate in money. I am therefore of opinion that nothing is to be awarded to Mr. Hollyday beyond proper compensation for the damage to his yacht.

We now come to the matter of the claim of Mrs. Annie E. Keene arising out of the death of her son. The question of the jurisdiction of the admiralty in the United States to entertain an action in rem for such a claim was ably argued by counsel and was discussed with great learning and research. I listened with great pleasure and instruction to the discussion, but I do not think that in this court the question can now be considered an open one. Upon appeal from this court, Chief Justice Chase sitting in the circuit court, decided the precise question in the case of The Sea Gull [Case No. 12,578], and held that damages could be recovered by a libel in rem in admiralty for the wrongful death of a person, independent of statutory remedy. This was conceded to be contrary to the common law and to the admiralty decisions in England. The question has never been passed upon by the supreme court, and their determination of it we cannot anticipate. Meanwhile the decision in the case of The Sea Gull [supra] has been followed in subsequent cases in this court and by the district judge of New York in the case of The City of Brussels [Case No. 2,745], and by Circuit Judge McKennan, affirming a decree of District Judge Cadwallader in the case of The Towanda [Id. 14,109]; and more recently by District Judge

Swing in the Southern district of Ohio in The Charles Morgan [Id. 2,618]. I therefore sustain the jurisdiction of the court to entertain the libel.

The next point then to be determined is what is the measure of damages to be applied to this claim. The proof shows that young Keene was eighteen and a half years old, and therefore lacked but two and a half years of his majority. It appears that at the time of his death he was employed as a clerk and salesman in the city of Baltimore, and was receiving eight dollars a week salary. It was proven that from the manner of his living, his social position and the society he frequented, the actual cost of his maintenance, in dress, board and lodging and necessary incidental expenditures, could not have been less than $500 a year. It would therefore appear from the proof that at the time of his death he was earning less by about $100 a year than it was costing to maintain him. His brother-in-law did testify that at the time of his death arrangements were about being perfected to establish him as the agent of the branch in Baltimore of a business about to be started in New York, and that large gains would have accrued to him amounting to perhaps $1,000 or $1,200 a year. But this was shown to be merely a hope and a sanguine expectation that might as likely end in failure as success. In this class of cases, whether brought under Lord Campbell's act in England or under similar acts in this country, it has been settled that only compensation for the pecuniary loss to the survivors is contemplated, and nothing is to be allowed for the sufferings of the deceased or the grief of surviving relatives or a solace for bereavement. In a Maryland case (Coughlan v. Baltimore & O. R. Co., 24 Md. 107) it was decided where a widow sued for the damages resulting from the wrongful death of her infant child, that the law entitles the mother to the services of her child during minority only, that beyond this chances of survivorship, his ability or willingness to support her, and her mental sufferings resulting from the death of her child, are matters too vague to enter into an estimate of damages intended to be merely compensatory. It is true that both in England and in some of our states it has been decided that damages are given not only with reference to a legal claim, but may also be calculated in reference to a reasonable expectation of pecuniary benefit extending during life. Dalton v. Southeastern Ry. Co., 4 C. B. (N. S.) 296; Franklin v. Southeastern Ry. Co., 3 Hurl. & N. 211. But in these cases there was proof to show that the person whose death was complained of had been in the habit of contributing money or services for the benefit of the plaintiff, and the jury were required to find that although the plaintiff had no legal claim on the deceased there was a reasonable expectation that the deceased would have continued to be able and willing in the future to contribute an equal amount of money or service. There was something therefore upon which to base an estimate of damage, and the jury was instructed not to make a mere guess but to be satisfied that there had been an actual loss of pecuniary benefit which might have been reasonably expected to continue if the deceased had lived. There is undoubtedly difficulty in reconciling these restrictions of the amount of damage to be allowed with the reasoning of the supreme court in the case of Railroad Co. v. Barron, 5 Wall. [72 U. S.] 90. In that case a passenger had been killed in a railroad accident, and the court would seem to hold that the whole matter of the damage to his next of kin must be left to the sound sense and deliberate judgment of the jury: a decision contrary to the usual tendency of courts to restrain the excesses into which juries are apt to run in such cases. It is to be noticed however that the case is based upon a statute of Illinois providing that the action shall be brought in the name of the personal representatives of the deceased, and the jury are directed to give what they shall deem a fair and just compensation for the pecuniary injury resulting from the death to the wife and next of kin of the deceased person, not exceeding $5,000. The circuit judge in his charge tells the jury that the policy of this law was evidently to make common carriers more circumspect in regard to lives entrusted to their care, and it is in that spirit that the statute was interpreted. But even in that case the jury were told that they were not to consider the pain suffered by the deceased or the grief of the surviving relatives, and that no damages were to be given by way of punishment. That they should consider the character, age, business habits, and means of the deceased, and whether such a man was likely to experience an increase or decrease of fortune if he continued to live, and that they might consider the contingency of his marrying and his property going in another channel. So in this case I must consider all similar facts and contingencies with regard to young Keene, so far as there is proof upon which to base such consideration; and having done so and taking note of the expense of recovering and interring his body, but allowing nothing by way of punishment and nothing for the bereavement of his relatives, I do not find this to be a case of any considerable pecuniary damage. I shall award to the libellant Mary E. Keene the sum of seven hundred dollars.

[NOTE. It was generally held in the United States prior to 1886 that a libel might be maintained in the admiralty for a maritime tort causing death. Cutting v. Seabury, Case No. 3,521; The Charles Morgan, Id. 2,618; The Sea Gull, Id. 12,578; Holmes v. O. & C. Ry. Co., 5 Fed. 75; The Towanda, Case No. 14,109; The City of Brussels, Id. 2,745; The Columbia, 27 Fed. 704, and Armstrong v. Beadle, Case No. 541. Contra, The Sylvan Glen, 9 Fed. 335. In this last case it was decided that damages are not recoverable in rem in admiralty for the wrongful death of a person unless by special statute.

The doctrine has been since set at rest by the decision of the supreme court in The Harrisburg, 119 U. S. 209. 7 Sup. Ct. 144, in which Mr. Chief Justice Waite delivered the opinion of the court. He reviews the American cases upon the point, a majority of which cases follow the rule laid down by Mr. Chief Justice Chase in The Sea Gull. See note to Case No. 541.]