MORAGNE *v.* STATES MARINE LINES, INC., ET AL.

No. 175.   Argued March 4, 1970—Decided June 15, 1970

*Charles J. Hardee, Jr.,* argued the cause and filed briefs for petitioner.

*Dewey R. Villareal, Jr.,* argued the cause for respondent States Marine Lines, Inc.   With him on the brief were *John W. Boult* and *William A. Gillen.   David C. G. Kerr* argued the cause for respondent Gulf Florida Terminal Co.   On the brief were *George W. Ericksen* and *James B. McDonough, Jr.*

*Louis F. Claiborne* argued the cause for the United States as *amicus curiae* urging reversal.   With him on the brief were *Solicitor General Griswold, Assistant Attorney General Ruckelshaus, Joseph J. Connolly,* and *Alan S. Rosenthal.*

Briefs of *amici curiae* were filed by *David B. Kaplan* for the American Trial Lawyers Association, and by *Nathan Baker, pro se.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

We brought this case here to consider whether *The Harrisburg,* 119 U. S. 199, in which this Court held in 1886 that maritime law does not afford a cause of action

for wrongful death, should any longer be regarded as acceptable law.

The complaint sets forth that Edward Moragne, a longshoreman, was killed while working aboard the vessel *Palmetto State* in navigable waters within the State of Florida. Petitioner, as his widow and representative of his estate, brought this suit in a state court against respondent States Marine Lines, Inc., the owner of the vessel, to recover damages for wrongful death and for the pain and suffering experienced by the decedent prior to his death. The claims were predicated upon both negligence and the unseaworthiness of the vessel.

States Marine removed the case to the Federal District Court for the Middle District of Florida on the basis of diversity of citizenship, see 28 U. S. C. §§ 1332, 1441, and there filed a third-party complaint against respondent Gulf Florida Terminal Company, the decedent's employer, asserting that Gulf had contracted to perform stevedoring services on the vessel in a workmanlike manner and that any negligence or unseaworthiness causing the accident resulted from Gulf's operations.

Both States Marine and Gulf sought dismissal of the portion of petitioner's complaint that requested damages for wrongful death on the basis of unseaworthiness. They contended that maritime law provided no recovery for wrongful death within a State's territorial waters, and that the statutory right of action for death under Florida law, Fla. Stat. § 768.01 (1965), did not encompass unseaworthiness as a basis of liability. The District Court dismissed the challenged portion of the complaint on this ground, citing this Court's decision in *The Tungus* v. *Skovgaard,* 358 U. S. 588 (1959), and cases construing the state statute, but made the certification necessary under 28 U. S. C. § 1292 (b) to allow petitioner an interlocutory appeal to the Court of Appeals for the Fifth Circuit.

The Court of Appeals took advantage of a procedure furnished by state law, Fla. Stat. § 25.031 (1965), to certify to the Florida Supreme Court the question whether the state wrongful-death statute allowed recovery for unseaworthiness as that concept is understood in maritime law. After reviewing the history of the Florida Act, the state court answered this question in the negative. 211 So. 2d 161 (1968). On return of the case to the Court of Appeals, that court affirmed the District Court's order, rejecting petitioner's argument that she was entitled to reversal under federal maritime law without regard to the scope of the state statute. 409 F. 2d 32 (1969). The court stated that its disposition was compelled by our decision in *The Tungus.* We granted certiorari, 396 U. S. 900 (1969), and invited the United States to participate as *amicus curiae, id.,* at 952, to reconsider the important question of remedies under federal maritime law for tortious deaths on state territorial waters.

In *The Tungus* this Court divided on the consequences that should flow from the rule of maritime law that "in the absence of a statute there is no action for wrongful death," first announced in *The Harrisburg.* All members of the Court agreed that where a death on state territorial waters is left remediless by the general maritime law and by federal statutes, a remedy may be provided under any applicable state law giving a right of action for death by wrongful act. However, four Justices dissented from the Court's further holding that "when admiralty adopts a State's right of action for wrongful death, it must enforce the right as an integrated whole, with whatever conditions and limitations the creating State has attached." 358 U. S., at 592. The dissenters would have held that federal maritime law could utilize the state law to "supply a remedy" for breaches of federally imposed duties, without regard

to any substantive limitations contained in the state law. *Id.*, at 597, 599.

The extent of the role to be played by state law under *The Tungus* has been the subject of substantial debate and uncertainty in this Court, see *Hess* v. *United States*, 361 U. S. 314 (1960); *Goett* v. *Union Carbide Corp.*, 361 U. S. 340 (1960), with opinions on both sides of the question acknowledging the shortcomings in the present law. See 361 U. S., at 314–315, 338–339. On fresh consideration of the entire subject, we have concluded that the primary source of the confusion is not to be found in *The Tungus,* but in *The Harrisburg,* and that the latter decision, somewhat dubious even when rendered, is such an unjustifiable anomaly in the present maritime law that it should no longer be followed. We therefore reverse the judgment of the Court of Appeals.[1]

---

[1] Respondents argue that petitioner is foreclosed from seeking a remedy for wrongful death under general maritime law by her failure to invoke that law at the proper time in the courts below. In the state trial court, which was bound to apply federal maritime law in a case within federal admiralty jurisdiction, *e. g., Hess* v. *United States,* 361 U. S., at 318; *McAllister* v. *Magnolia Petroleum Co.,* 357 U. S. 221 (1958), petitioner supported her unseaworthiness claim solely by arguing that the Florida death statute encompassed recovery for unseaworthiness. Under federal law as declared by *The Tungus,* this was the only theory on which she could proceed, short of a challenge—which she did not make—to the validity of *The Tungus* itself. After the District Court on removal rejected her claim, petitioner presented to the Court of Appeals only the question of the interpretation of the state statute, until that question was definitively settled against her by the State Supreme Court on referral.

At that point, petitioner moved the Court of Appeals to uphold her claim as a matter of federal law, despite the state court's ruling. In her brief in support of this motion, petitioner urged that the rule of *The Tungus* was unsound; that the Florida Supreme Court's decision in this case was the first since *The Tungus* in which a state court had read its wrongful-death act to exclude unseaworthiness; and that the lack of uniformity thus produced dictated a re-examina-

## I

The Court's opinion in *The Harrisburg* acknowledged that the result reached had little justification except in primitive English legal history—a history far removed from the American law of remedies for maritime deaths.

tion of *The Tungus* and adoption of the views of the dissenters in that case. The Court of Appeals heard oral argument on the motion and granted petitioner leave to file a further brief after argument. Respondents opposed the motion and moved to affirm on the basis of *The Tungus,* respondent Gulf arguing that: "Appellant [petitioner] has no Federal or maritime action for wrongful death," and that: "[T]he issues discussed in Appellant's Brief have been thoroughly argued in Briefs heretofore filed." Neither respondent opposed consideration of the motion on the ground that the issue had not been properly raised.

The Court of Appeals affirmed, stating: "No useful purpose will be served by additional review of pertinent authority upon the issue of law presented in this appeal. It is sufficient to say that in The Tungus v. Skovgaard, . . . the United States Supreme Court held that the question whether a State Wrongful Death Act encompasses a cause of action for unseaworthiness is a question to be decided by the courts of that state."

While this language is not in itself wholly clear, we think it evident in the circumstances that the Court of Appeals considered and rejected petitioner's attack on *The Tungus.* After granting petitioner an opportunity to present that attack at length, and without receiving any objections from respondents to its consideration, the Court of Appeals cannot be presumed to have refused to entertain it. Rather, we read the opinion as stating that the court deemed itself bound by *The Tungus* despite petitioner's challenge to that decision. The Court of Appeals had earlier voiced strong criticism of the prevailing law in this area, but had concluded that it was bound to follow *The Harrisburg* and *The Tungus. Kenney* v. *Trinidad Corp.,* 349 F. 2d 832, 840–841 (C. A. 5th Cir. 1965).

Since the Court of Appeals, without objection, treated the merits of petitioner's attack on *The Tungus,* we need not consider whether she might otherwise be precluded from pressing that attack here because of her default in failing to urge the same theory in the trial courts. See *Neely* v. *Martin K. Eby Constr. Co.,* 386 U. S. 317, 330 (1967); *Giordenello* v. *United States,* 357 U. S. 480 (1958);

That case, like this, was a suit on behalf of the family of a maritime worker for his death on the navigable waters of a State. Following several precedents in the lower federal courts, the trial court awarded damages against the ship causing the death, and the circuit court affirmed, ruling that death by maritime tort "may be complained of as an injury, and the wrong redressed under the general maritime law." 15 F. 610, 614 (1883). This Court, in reversing, relied primarily on its then-recent decision in *Insurance Co. v. Brame*, 95 U. S. 754 (1878), in which it had held that in American common law, as in English, "no civil action lies for an injury which results in . . . death." *Id.*, at 756.[2] In *The Harrisburg*, as in *Brame*, the Court did not examine the justifications for this common-law rule; rather, it simply noted that "we know of no country that has adopted a different rule on this subject for the sea from that which it maintains on the land," and concluded, despite contrary decisions of the lower federal courts both before and after *Brame*, that the rule of *Brame* should apply equally to maritime deaths. 119 U. S., at 213.[3]

---

*California* v. *Taylor*, 353 U. S. 553, 557 n. 2 (1957); *Husty* v. *United States*, 282 U. S. 694, 701–702 (1931); *Tyrrell* v. *District of Columbia*, 243 U. S. 1 (1917); cf. *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130, 145 (1967) (opinion of HARLAN, J.). Her challenge to *The Tungus* is properly before us on certiorari, and, of course, it subsumes the question of the continuing validity of *The Harrisburg*, upon which *The Tungus* rests. This Court suggested, 396 U. S. 952 (1969), that the parties and the Solicitor General address themselves to the question whether *The Harrisburg*, 119 U. S. 199, should be overruled, and the parties and *amici* have fully addressed themselves to that case as well as *The Tungus*.

[2] *Brame* was decided, of course, at a time when the federal courts under *Swift* v. *Tyson*, 16 Pet. 1 (1842), expounded a general federal common law.

[3] The Court stated:

"The argument everywhere in support of such suits in admiralty has been, not that the maritime law, as actually administered in com-

Our analysis of the history of the common-law rule indicates that it was based on a particular set of factors that had, when *The Harrisburg* was decided, long since been thrown into discard even in England, and that had never existed in this country at all. Further, regardless of the viability of the rule in 1886 as applied to American land-based affairs, it is difficult to discern an adequate reason for its extension to admiralty, a system of law then already differentiated in many respects from the common law.

One would expect, upon an inquiry into the sources of the common-law rule, to find a clear and compelling justification for what seems a striking departure from the result dictated by elementary principles in the law of remedies. Where existing law imposes a primary duty, violations of which are compensable if they cause injury, nothing in ordinary notions of justice suggests that a violation should be nonactionable simply because it was serious enough to cause death. On the contrary, that rule has been criticized ever since its inception, and described in such terms as "barbarous." *E. g., Osborn* v. *Gillett,* L. R. 8 Ex. 88, 94 (1873) (Lord Bramwell, dissenting) ; F. Pollock, Law of Torts 55 (Landon ed. 1951) ; 3 W. Holdsworth, History of English Law 676–677 (3d ed. 1927). Because the primary duty already exists,

mon law countries, is different from the common law in this particular, but that the common law is not founded on good reason, and is contrary to 'natural equity and the general principles of law.' Since, however, it is now established that in the courts of the United States no action at law can be maintained for such a wrong in the absence of a statute giving the right, and it has not been shown that the maritime law, as accepted and received by maritime nations generally, has established a different rule for the government of the courts of admiralty from those which govern courts of law in matters of this kind, we are forced to the conclusion that no such action will lie in the courts of the United States under the general maritime law." 119 U. S., at 213.

the decision whether to allow recovery for violations causing death is entirely a remedial matter. It is true that the harms to be assuaged are not identical in the two cases: in the case of mere injury, the person physically harmed is made whole for his harm, while in the case of death, those closest to him—usually spouse and children—seek to recover for their total loss of one on whom they depended. This difference, however, even when coupled with the practical difficulties of defining the class of beneficiaries who may recover for death, does not seem to account for the law's refusal to recognize a wrongful killing as an actionable tort. One expects, therefore, to find a persuasive, independent justification for this apparent legal anomaly.

Legal historians have concluded that the sole substantial basis for the rule at common law is a feature of the early English law that did not survive into this century—the felony-merger doctrine. See Pollock, *supra*, at 52–57; Holdsworth, The Origin of the Rule in *Baker* v. *Bolton*, 32 L. Q. Rev. 431 (1916). According to this doctrine, the common law did not allow civil recovery for an act that constituted both a tort and a felony. The tort was treated as less important than the offense against the Crown, and was merged into, or pre-empted by, the felony. *Smith* v. *Sykes*, 1 Freem. 224, 89 Eng. Rep. 160 (K. B. 1677); *Higgins* v. *Butcher*, Yel. 89, 80 Eng. Rep. 61 (K. B. 1606). The doctrine found practical justification in the fact that the punishment for the felony was the death of the felon and the forfeiture of his property to the Crown; thus, after the crime had been punished, nothing remained of the felon or his property on which to base a civil action. Since all intentional or negligent homicide was felonious, there could be no civil suit for wrongful death.

The first explicit statement of the common-law rule against recovery for wrongful death came in the opinion

of Lord Ellenborough, sitting at *nisi prius,* in *Baker* v. *Bolton,* 1 Camp. 493, 170 Eng. Rep. 1033 (1808). That opinion did not cite authority, or give supporting reasoning, or refer to the felony-merger doctrine in announcing that "[i]n a civil Court, the death of a human being could not be complained of as an injury." *Ibid.* Nor had the felony-merger doctrine seemingly been cited as the basis for the denial of recovery in any of the other reported wrongful-death cases since the earliest ones, in the 17th century. *E. g., Smith* v. *Sykes, supra; Higgins* v. *Butcher, supra.* However, it seems clear from those first cases that the rule of *Baker* v. *Bolton* did derive from the felony-merger doctrine, and that there was no other ground on which it might be supported even at the time of its inception. The House of Lords in 1916 confirmed this historical derivation, and held that although the felony-merger doctrine was no longer part of the law, the rule against recovery for wrongful death should continue except as modified by statute. *Admiralty Commissioners* v. *S. S. Amerika,* [1917] A. C. 38. Lord Parker's opinion acknowledged that the rule was "anomalous . . . to the scientific jurist," but concluded that because it had once found justification in the doctrine that "the trespass was drowned in the felony," it should continue as a rule "explicable on historical grounds" even after the disappearance of that justification. *Id.,* at 44, 50; see 3 W. Holdsworth, History of English Law 676–677 (3d ed. 1927). Lord Sumner agreed, relying in part on the fact that this Court had adopted the English rule in *Brame.* Although conceding the force of Lord Bramwell's dissent in *Osborn* v. *Gillett,* L. R. 8 Ex. 88, 93 (1873), against the rule, Lord Parker stated that it was not "any part of the functions of this House to consider what rules ought to prevail in a logical and scientific system of jurisprudence," and thus that he

was bound simply to follow the past decisions. [1917] A. C., at 42–43.[4]

The historical justification marshaled for the rule in England never existed in this country. In limited instances American law did adopt a vestige of the felony-merger doctrine, to the effect that a civil action was delayed until after the criminal trial. However, in this country the felony punishment did not include forfeiture of property; therefore, there was nothing, even in those limited instances, to bar a subsequent civil suit. *E. g., Grosso* v. *Delaware, Lackawanna & West. R. Co.,* 50 N. J. L. 317, 319–320, 13 A. 233, 234 (1888); *Hyatt* v. *Adams,* 16 Mich. 180, 185–188 (1867); see W. Prosser, Law of Torts 8, 920–924 (3d ed. 1964). Nevertheless, despite some early cases in which the rule was rejected as "incapable of vindication," *e. g., Sullivan* v. *Union Pac. R. Co.,* 23 F. Cas. 368, 371 (No. 13,599) (C. C. Neb. 1874); *Shields* v. *Yonge,* 15 Ga. 349 (1854); cf. *Cross* v. *Guthery,* 2 Root 90, 92 (Conn. 1794), American courts generally adopted the English rule as the common law of this country as well. Throughout the period of this adoption, culminating in this Court's decision in *Brame,*

---

[4] The decision in *S. S. Amerika* was placed also on an alternative ground, which is independently sufficient. In that case, which arose from a collision between a Royal Navy submarine and a private vessel, the Crown sought to recover from the owners of the private vessel the pensions payable to the families of navy sailors who died in the collision. The first ground given for rejecting the claim was that the damages sought were too remote to be protected by tort law, because the pensions were voluntary payments and because they were not a measure of "the future services of which the Admiralty had been deprived." *Id.,* at 42, 50–51. Similar alternative reasoning was given in *Brame,* which involved a similar situation. 95 U. S., at 758–759. Thus, in neither case was the enunciation of the rule against recovery for wrongful death necessary to the result.

the courts failed to produce any satisfactory justification for applying the rule in this country.

Some courts explained that their holdings were prompted by an asserted difficulty in computation of damages for wrongful death or by a "repugnance . . . to setting a price upon human life." *E. g., Connecticut Mut. Life Ins. Co.* v. *New York & N. H. R. Co.,* 25 Conn. 265, 272–273 (1856); *Hyatt* v. *Adams, supra,* at 191. However, other courts have recognized that calculation of the loss sustained by dependents or by the estate of the deceased, which is required under most present wrongful-death statutes, see Smith, Wrongful Death Damages in North Carolina, 44 N. C. L. Rev. 402, 405–406, nn. 17, 18 (1966), does not present difficulties more insurmountable than assessment of damages for many nonfatal personal injuries. See *Hollyday* v. *The David Reeves,* 12 F. Cas. 386, 388 (No. 6,625) (D. C. Md. 1879); *Green* v. *Hudson River R. Co.,* 28 Barb. 9, 17–18 (N. Y. 1858).

It was suggested by some courts and commentators that the prohibition of nonstatutory wrongful-death actions derived support from the ancient common-law rule that a personal cause of action in tort did not survive the death of its possessor, *e. g., Eden* v. *Lexington & Frankfort R. Co.,* 53 Ky. 204, 206 (1853); and the decision in *Baker* v. *Bolton* itself may have been influenced by this principle. Holdsworth, The Origin of the Rule in *Baker* v. *Bolton,* 32 L. Q. Rev. 431, 435 (1916). However, it is now universally recognized that because this principle pertains only to the victim's own personal claims, such as for pain and suffering, it has no bearing on the question whether a dependent should be permitted to recover for the injury he suffers from the victim's death. See *ibid.;* Pollock, *supra,* at 53; Win-

field, Death as Affecting Liability in Tort, 29 Col. L. Rev. 239–250, 253 (1929).

The most likely reason that the English rule was adopted in this country without much question is simply that it had the blessing of age. That was the thrust of this Court's opinion in *Brame,* as well as many of the lower court opinions. *E. g., Grosso* v. *Delaware, Lackawanna & West. R. Co., supra.* Such nearly automatic adoption seems at odds with the general principle, widely accepted during the early years of our Nation, that while "[o]ur ancestors brought with them [the] general principles [of the common law] and claimed it as their birthright; . . . they brought with them and adopted only that portion which was applicable to their situation." *Van Ness* v. *Pacard,* 2 Pet. 137, 144 (1829) (Story, J.); *The Lottawanna,* 21 Wall. 558, 571–574 (1875); see R. Pound, The Formative Era of American Law 93–97 (1938); H. Hart & A. Sacks, The Legal Process 450 (tent. ed. 1958). The American courts never made the inquiry whether this particular English rule, bitterly criticized in England, "was applicable to their situation," and it is difficult to imagine on what basis they might have concluded that it was.

Further, even after the decision in *Brame,* it is not apparent why the Court in *The Harrisburg* concluded that there should not be a different rule for admiralty from that applied at common law. Maritime law had always, in this country as in England, been a thing apart from the common law. It was, to a large extent, administered by different courts; it owed a much greater debt to the civil law;[5] and, from its focus on a par-

---

[5] The Court in *The Harrisburg* acknowledged that, at least according to the courts of France, the civil law did allow recovery for the injury suffered by dependents of a person killed. It noted, however, that the Louisiana courts took a different view of the civil law, and that English maritime law did not seem to differ in this

ticular subject matter, it developed general principles unknown to the common law. These principles included a special solicitude for the welfare of those men who undertook to venture upon hazardous and unpredictable sea voyages. See generally G. Gilmore & C. Black, The Law of Admiralty 1–11, 253 (1957); P. Edelman, Maritime Injury and Death 1 (1960). These factors suggest that there might have been no anomaly in adoption of a different rule to govern maritime relations, and that the common-law rule, criticized as unjust in its own domain, might wisely have been rejected as incompatible with the law of the sea. This was the conclusion reached by Chief Justice Chase, prior to *The Harrisburg*, sitting on circuit in *The Sea Gull*, 21 F. Cas. 909 (No. 12,578) (C. C. Md. 1865). He there remarked that

> "There are cases, indeed, in which it has been held that in a suit at law, no redress can be had by the surviving representative for injuries occasioned by the death of one through the wrong of another; but these are all common-law cases, and the common law has its peculiar rules in relation to this subject, traceable to the feudal system and its forfeitures . . . and certainly it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules." *Id.*, at 910.

Numerous other federal maritime cases, on similar reasoning, had reached the same result. *E. g., The Columbia*, 27 F. 704 (D. C. S. D. N. Y. 1886); *The Manhasset*, 18 F. 918 (D. C. E. D. Va. 1884); *The E. B.*

---

regard from English common law. 119 U. S., at 205, 212–213. See generally *Grigsby* v. *Coast Marine Service*, 412 F. 2d 1011, 1023–1029 (C. A. 5th Cir. 1969); 1 E. Benedict, Law of American Admiralty 2 (6th ed. Knauth 1940); 4 *id.*, at 358.

*Ward, Jr.,* 17 F. 456 (C. C. E. D. La. 1883); *The Garland,*
5 F. 924 (D. C. E. D. Mich. 1881); *Holmes* v. *O. & C. R.
Co.,* 5 F. 75 (D. C. Ore. 1880); *The Towanda,* 24 F. Cas.
74 (No. 14,109) (C. C. E. D. Pa. 1877); *Plummer* v.
*Webb,* 19 F. Cas. 894 (No. 11,234) (D. C. Maine 1825);
*Hollyday* v. *The David Reeves,* 12 F. Cas. 386 (No.
6,625) (D. C. Md. 1879). Despite the tenor of these
cases, some decided after *Brame,* the Court in *The Harris-
burg* concluded that "the admiralty judges in the United
States did not rely for their jurisdiction on any rule of
the maritime law different from that of the common law,
but [only] on their opinion that the rule of the English
common law was not founded in reason, and had not
become firmly established in the jurisprudence of this
country." 119 U. S., at 208. Without discussing any
considerations that might support a different rule for
admiralty, the Court held that maritime law must be
identical in this respect to the common law.

## II

We need not, however, pronounce a verdict on whether
*The Harrisburg,* when decided, was a correct extrapola-
tion of the principles of decisional law then in existence.
A development of major significance has intervened,
making clear that the rule against recovery for wrongful
death is sharply out of keeping with the policies of
modern American maritime law. This development is
the wholesale abandonment of the rule in most of the
areas where it once held sway, quite evidently prompted
by the same sense of the rule's injustice that generated
so much criticism of its original promulgation.

To some extent this rejection has been judicial. The
English House of Lords in 1937 emasculated the rule
without expressly overruling it. *Rose* v. *Ford,* [1937]
A. C. 826. Lord Atkin remarked about the decision in
*S. S. Amerika* that "[t]he reasons given, whether his-

torical or otherwise, may seem unsatisfactory," and that "if the rule is really based on the relevant death being due to felony, it should long ago have been relegated to a museum." At any rate, he saw "no reason for extending the illogical doctrine . . . to any case where it does not clearly apply." *Id.*, at 833, 834. Lord Atkin concluded that, while the doctrine barred recognition of a claim in the dependents for the wrongful death of a person, it did not bar recognition of a common-law claim in the decedent himself for "loss of expectation of life"—a claim that vested in the person in the interval between the injury and death, and thereupon passed, with the aid of a survival statute, to the representative of his estate. He expressed no doubt that the claim was "capable of being estimated in terms of money: and that the calculation should be made." *Id.*, at 834.[6] Thus, except that the measure of damages might differ, the representative was allowed to recover on behalf of the heirs what they could not recover in their own names.

Much earlier, however, the legislatures both here and in England began to evidence unanimous disapproval of the rule against recovery for wrongful death. The first statute partially abrogating the rule was Lord Campbell's Act, 9 & 10 Vict., c. 93 (1846), which granted recovery to the families of persons killed by tortious conduct, "although the Death shall have been caused under such Circumstances as amount in Law to Felony."[7]

---

[6] Lord Wright, concurring, stated:

"In one sense it is true that no money can be compensation for life or the enjoyment of life, and in that sense it is impossible to fix compensation for the shortening of life. But it is the best the law can do. It would be paradoxical if the law refused to give any compensation at all because none could be adequate." [1937] A. C., at 848.

[7] It has been suggested that one reason the common-law rule was tolerated in England as long as it was may have been that the relatives of persons killed by wrongful acts often were able to exact

In the United States, every State today has enacted a wrongful-death statute. See Smith, *supra*, 44 N. C. L. Rev. 402. The Congress has created actions for wrongful deaths of railroad employees, Federal Employers' Liability Act, 45 U. S. C. §§ 51–59; of merchant seamen, Jones Act, 46 U. S. C. § 688; and of persons on the high seas, Death on the High Seas Act, 46 U. S. C. §§ 761, 762.[8] Congress has also, in the Federal Tort Claims Act, 28 U. S. C. § 1346 (b), made the United States subject to liability in certain circumstances for negligently caused wrongful death to the same extent as a private person. See, *e. g., Richards* v. *United States,* 369 U. S. 1 (1962).

These numerous and broadly applicable statutes, taken as a whole, make it clear that there is no present public policy against allowing recovery for wrongful death. The statutes evidence a wide rejection by the legislatures of whatever justifications may once have existed for a general refusal to allow such recovery. This legislative establishment of policy carries significance beyond the particular scope of each of the statutes involved. The policy thus established has become itself a part of our

---

compensation from the wrongdoer by threatening to bring a "criminal appeal." The criminal appeal was a criminal proceeding brought by a private person, and was for many years more common than indictment as a means of punishing homicide. Though a successful appeal would not produce a monetary recovery, the threat of one served as an informal substitute for a civil suit for damages. Over the years, indictment became more common, and the criminal appeal was abolished by statute in 1819. *59 Geo. 3, c. 46.* See Holdsworth, The Origin of the Rule in *Baker* v. *Bolton,* 32 L. Q. Rev. 431, 435 (1916); *Admiralty Commissioners* v. *S. S. Amerika,* [1917] A. C., at 58–59.

[8] See also National Parks Act, 16 U. S. C. § 457; Outer Continental Shelf Lands Act, 43 U. S. C. §§ 1331–1343 (making state wrongful-death statutes applicable to particular areas within federal jurisdiction). Cf. n. 16, *infra*.

law, to be given its appropriate weight not only in matters of statutory construction but also in those of decisional law.   See Landis, Statutes and the Sources of Law, in Harvard Legal Essays 213, 226–227 (1934).   Mr. Justice Holmes, speaking also for Chief Justice Taft and Justices Brandeis and McKenna, stated on the very topic of remedies for wrongful death:

> "[I]t seems to me that courts in dealing with statutes sometimes have been too slow to recognize that statutes even when in terms covering only particular cases may imply a policy different from that of the common law, and therefore may exclude a reference to the common law for the purpose of limiting their scope. *Johnson* v. *United States,* 163 Fed. 30, 32. Without going into the reasons for the notion that an action (other than an appeal) does not lie for causing the death of a human being, it is enough to say that they have disappeared.   The policy that forbade such an action, if it was more profound than the absence of a remedy when a man's body was hanged and his goods confiscated for the felony, has been shown not to be the policy of present law by statutes of the United States and of most if not all of the States." *Panama R. Co.* v. *Rock,* 266 U. S. 209, 216 (1924) (dissenting opinion).[9]

Dean Pound subsequently echoed this observation, concluding that: "Today we should be thinking of the death

---

[9] The *Rock* case involved the question whether an action for wrongful death was maintainable in the Panama Canal Zone, under a general statute that simply embodied the civil-law principle of liability for damage caused by fault.   The majority's decision, engrafting onto this statute the common-law rule forbidding such recovery despite the fact that the rule had then been rejected by every relevant jurisdiction, was immediately repudiated by congressional action.   Act of Dec. 29, 1926, § 7, 44 Stat. 927; see Landis, *supra,* at 227.

statutes as part of the general law." Pound, Comment on State Death Statutes—Application to Death in Admiralty, 13 NACCA L. J. 188, 189 (1954); see *Cox v. Roth,* 348 U. S. 207, 210 (1955).

This appreciation of the broader role played by legislation in the development of the law reflects the practices of common-law courts from the most ancient times. As Professor Landis has said, "much of what is ordinarily regarded as 'common law' finds its source in legislative enactment." Landis, *supra,* at 214. It has always been the duty of the common-law court to perceive the impact of major legislative innovations and to interweave the new legislative policies with the inherited body of common-law principles—many of them deriving from earlier legislative exertions.

The legislature does not, of course, merely enact general policies. By the terms of a statute, it also indicates its conception of the sphere within which the policy is to have effect. In many cases the scope of a statute may reflect nothing more than the dimensions of the particular problem that came to the attention of the legislature, inviting the conclusion that the legislative policy is equally applicable to other situations in which the mischief is identical. This conclusion is reinforced where there exists not one enactment but a course of legislation dealing with a series of situations, and where the generality of the underlying principle is attested by the legislation of other jurisdictions. *Id.,* at 215–216, 220–222. On the other hand, the legislature may, in order to promote other, conflicting interests, prescribe with particularity the compass of the legislative aim, erecting a strong inference that territories beyond the boundaries so drawn are not to feel the impact of the new legislative dispensation. We must, therefore, analyze with care the congressional enactments that have abrogated the common-law rule in the maritime field, to

determine the impact of the fact that none applies in terms to the situation of this case. See Part III, *infra*. However, it is sufficient at this point to conclude, as Mr. Justice Holmes did 45 years ago, that the work of the legislatures has made the allowance of recovery for wrongful death the general rule of American law, and its denial the exception. Where death is caused by the breach of a duty imposed by federal maritime law, Congress has established a policy favoring recovery in the absence of a legislative direction to except a particular class of cases.

### III

Our undertaking, therefore, is to determine whether Congress has given such a direction in its legislation granting remedies for wrongful deaths in portions of the maritime domain. We find that Congress has given no affirmative indication of an intent to preclude the judicial allowance of a remedy for wrongful death to persons in the situation of this petitioner.

From the date of *The Harrisburg* until 1920, there was no remedy for death on the high seas caused by breach of one of the duties imposed by federal maritime law. For deaths within state territorial waters, the federal law accommodated the humane policies of state wrongful-death statutes by allowing recovery whenever an applicable state statute favored such recovery.[10] Congress acted in 1920 to furnish the remedy denied by the courts for deaths beyond the jurisdiction of any State, by pass-

[10] The general understanding was that the statutes of the coastal States, which provided remedies for deaths within territorial waters, did not apply beyond state boundaries. This Court had suggested, in an early case where the plaintiff and defendant were of the same State, that the law of that State could be applied to a death on the high seas, if the State intended its law to have such scope. *The Hamilton*, 207 U. S. 398 (1907). However, probably because most state death statutes were not meant to have application to the high seas, this possibility did little to fill the vacuum.

ing two landmark statutes. The first of these was the Death on the High Seas Act, 41 Stat. 537, 46 U. S. C. § 761 *et seq.* Section 1 of that Act provides that:

"Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, . . . the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued."

Section 7 of the Act further provides:

"The provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this [Act]. Nor shall this [Act] apply to the Great Lakes or to any waters within the territorial limits of any State . . . ."

The second statute was the Jones Act, 41 Stat. 1007, 46 U. S. C. § 688, which, by extending to seamen the protections of the Federal Employers' Liability Act, provided a right of recovery against their employers for negligence resulting in injury or death. This right follows from the seaman's employment status and is not limited to injury or death occurring on the high seas.[11]

---

[11] In 1927 Congress passed the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, 33 U. S. C. § 901 *et seq.*, granting to longshoremen the right to receive workmen's compensation benefits from their employers for accidental injury or death arising out of their employment. These benefits are made exclusive of any other liability for employers who comply with the Act. The Act does not, however, affect the longshoreman's remedies against persons other than his employer, such as a shipowner, and therefore

The United States, participating as *amicus curiae*, contended at oral argument that these statutes, if construed to forbid recognition of a general maritime remedy for wrongful death within territorial waters, would perpetuate three anomalies of present law. The first of these is simply the discrepancy produced whenever the rule of *The Harrisburg* holds sway: within territorial waters, identical conduct violating federal law (here the furnishing of an unseaworthy vessel) produces liability if the victim is merely injured, but frequently not if he is killed. As we have concluded, such a distinction is not compatible with the general policies of federal maritime law.

The second incongruity is that identical breaches of the duty to provide a seaworthy ship, resulting in death, produce liability outside the three-mile limit—since a claim under the Death on the High Seas Act may be founded on unseaworthiness, see *Kernan* v. *American Dredging Co.,* 355 U. S. 426, 430 n. 4 (1958)—but not within the territorial waters of a State whose local statute excludes unseaworthiness claims. The United States argues that since the substantive duty is federal, and federal maritime jurisdiction covers navigable waters within and without the three-mile limit, no rational policy supports this distinction in the availability of a remedy.

The third, and assertedly the "strangest" anomaly is that a true seaman—that is, a member of a ship's company, covered by the Jones Act—is provided no remedy for death caused by unseaworthiness within territorial waters, while a longshoreman, to whom the duty of seaworthiness was extended only because he performs work

---

does not bear on the problem before us except perhaps to serve as yet another example of congressional action to allow recovery for death in circumstances where recovery is allowed for nonfatal injuries.

traditionally done by seamen, does have such a remedy when allowed by a state statute.[12]

There is much force to the United States' argument that these distinctions are so lacking in any apparent justification that we should not, in the absence of compelling evidence, presume that Congress affirmatively intended to freeze them into maritime law. There should be no presumption that Congress has removed this Court's traditional responsibility to vindicate the policies of maritime law by ceding that function exclusively to the

---

[12] A joint contributor to this last situation, in conjunction with the rule of *The Harrisburg*, is the decision in *Gillespie* v. *United States Steel Corp.*, 379 U. S. 148 (1964), where the Court held that the Jones Act, by providing a claim for wrongful death based on negligence, precludes any state remedy for wrongful death of a seaman in territorial waters—whether based on negligence or unseaworthiness. The Court's ruling in *Gillespie* was only that the Jones Act, which was "intended to bring about the uniformity in the exercise of admiralty jurisdiction required by the Constitution, . . . necessarily supersedes the application of the death statutes of the several States." *Id.*, at 155. The ruling thus does not disturb the seaman's rights under general maritime law, existing alongside his Jones Act claim, to sue his employer for injuries caused by unseaworthiness, see *McAllister* v. *Magnolia Petroleum Co.*, 357 U. S. 221 (1958), or for death on the high seas caused by unseaworthiness, see *Kernan* v. *American Dredging Co.*, 355 U. S. 426, 430 n. 4 (1958); *Doyle* v. *Albatross Tanker Corp.*, 367 F. 2d 465 (C. A. 2d Cir. 1966); cf. *Pope & Talbot, Inc.* v. *Hawn*, 346 U. S. 406 (1953). Likewise, the remedy under general maritime law that will be made available by our overruling today of *The Harrisburg* seems to be beyond the preclusive effect of the Jones Act as interpreted in *Gillespie*. The existence of a maritime remedy for deaths of seamen in territorial waters will further, rather than hinder, "uniformity in the exercise of admiralty jurisdiction"; and, of course, no question of preclusion of a *federal* remedy was before the Court in *Gillespie* or its predecessor, *Lindgren* v. *United States*, 281 U. S. 38 (1930), since no such remedy was thought to exist at the time those cases were decided. See Gilmore & Black, *supra*, at 304; but cf. *Kernan* v. *American Dredging Co.*, 355 U. S., at 429–430.

States. However, respondents argue that an intent to do just that is manifested by the portions of the Death on the High Seas Act quoted above.

The legislative history of the Act suggests that respondents misconceive the thrust of the congressional concern. Both the Senate and House Reports consist primarily of quoted remarks by supporters of the proposed Act. Those supporters stated that the rule of *The Harrisburg,* which had been rejected by "[e]very country of western Europe," was "a disgrace to a civilized people." "There is no reason why the admiralty law of the United States should longer depend on the statute laws of the States. . . . Congress can now bring our maritime law into line with the laws of those enlightened nations which confer a right of action for death at sea." The Act would accomplish that result "for deaths on the high seas, leaving unimpaired the rights under State statutes as to deaths on waters within the territorial jurisdiction of the States. . . . This is for the purpose of uniformity, as the States can not properly legislate for the high seas." S. Rep. No. 216, 66th Cong., 1st Sess., 3, 4 (1919); H. R. Rep. No. 674, 66th Cong., 2d Sess., 3, 4 (1920). The discussion of the bill on the floor of the House evidenced the same concern that a cause of action be provided "in cases where there is now no remedy," 59 Cong. Rec. 4486, and at the same time that "the power of the States to create actions for wrongful death in no way be affected by enactment of the federal law." *The Tungus* v. *Skovgaard,* 358 U. S., at 593.

Read in light of the state of maritime law in 1920, we believe this legislative history indicates that Congress intended to ensure the continued availability of a remedy, historically provided by the States, for deaths in territorial waters; its failure to extend the Act to cover such deaths primarily reflected the lack of necessity for coverage by a federal statute, rather than an affirmative

desire to insulate such deaths from the benefits of any federal remedy that might be available independently of the Act. The void that existed in maritime law up until 1920 was the absence of any remedy for wrongful death on the high seas. Congress, in acting to fill that void, legislated only to the three-mile limit because that was the extent of the problem.[13] The express provision that state remedies in territorial waters were not disturbed by the Act ensured that Congress' solution of one problem would not create another by inviting the courts to find that the Act pre-empted the entire field, destroying the state remedies that had previously existed.

The beneficiaries of persons meeting death on territorial waters did not suffer at that time from being excluded from the coverage of the Act. To the contrary, the state remedies that were left undisturbed not only were familiar but also may actually have been more generous than the remedy provided by the new Act. On the one hand, the primary basis of recovery under state wrongful-death statutes was negligence. On the other hand, the substantive duties imposed at that time by general maritime law were vastly different from those that presently exist. "[T]he seaman's right to recover damages for injuries caused by unseaworthiness of the ship was an obscure and relatively little used remedy," perhaps largely because prior to this Court's decision in *Mahnich* v. *Southern S. S. Co.*, 321 U. S. 96 (1944),

---

[13] Similarly, when Parliament abrogated the English common-law rule by passing Lord Campbell's Act, it provided that "nothing therein contained shall apply to that Part of the United Kingdom called *Scotland*." 9 & 10 Vict., c. 93, § 6 (1846). The decisional law of Scotland had long recognized a right to recover for wrongful death; thus the mischief at which the statute aimed could be cured without disturbing Scottish law. The Act "excluded Scotland from its operation because a sufficient remedy already existed there when in England none existed at all." *Admiralty Commissioners* v. *S. S. Amerika,* [1917] A. C., at 52.

the shipowner's duty was only to use due diligence to provide a seaworthy ship. Gilmore & Black, *supra,* at 315, 361; Tetreault, Seamen, Seaworthiness, and the Rights of Harbor Workers, 39 Cornell L. Q. 381, 392–393, 396 (1954). Nonseamen on the high seas could generally recover for ordinary negligence, but even this was virtually denied to seamen under the peculiar maritime doctrine of *The Osceola,* 189 U. S. 158, 175 (1903). Congress in 1920 thus legislated against a backdrop of state laws that imposed a standard of behavior generally the same as—and in some respects perhaps more favorable than—that imposed by federal maritime law.

Since that time the equation has changed drastically, through this Court's transformation of the shipowner's duty to provide a seaworthy ship into an absolute duty not satisfied by due diligence. See, *e. g., Mahnich* v. *Southern S. S. Co., supra; Mitchell* v. *Trawler Racer, Inc.,* 362 U. S. 539 (1960). The unseaworthiness doctrine has become the principal vehicle for recovery by seamen for injury or death, overshadowing the negligence action made available by the Jones Act, see Gilmore & Black, *supra,* at 315–332; and it has achieved equal importance for longshoremen and other harbor workers to whom the duty of seaworthiness was extended because they perform work on the vessel traditionally done by seamen. *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85 (1946). The resulting discrepancy between the remedies for deaths covered by the Death on the High Seas Act and for deaths that happen to fall within a state wrongful-death statute not encompassing unseaworthiness could not have been foreseen by Congress. Congress merely declined to disturb state remedies at a time when they appeared adequate to effectuate the substantive duties imposed by general maritime law. That action cannot be read as an instruction to the federal courts that deaths in territorial waters, caused by breaches of the

evolving duty of seaworthiness, must be *damnum absque injuria* unless the States expand their remedies to match the scope of the federal duty.

To put it another way, the message of the Act is that it does not by its own force abrogate available state remedies; no intention appears that the Act have the effect of foreclosing any nonstatutory federal remedies that might be found appropriate to effectuate the policies of general maritime law.[14]

That our conclusion is wholly consistent with the congressional purpose is confirmed by the passage of the

---

[14] We note that § 1 of the Act, which authorizes "a suit for damages in the district courts of the United States, in admiralty," has been construed to place exclusive jurisdiction on the admiralty side of the federal courts for suits under the Act, *e. g., Devlin* v. *Flying Tiger Lines, Inc.,* 220 F. Supp. 924 (D. C. S. D. N. Y. 1963), although there was earlier authority to the contrary. *Bugden* v. *Trawler Cambridge,* 319 Mass. 315, 65 N. E. 2d 533 (1946). If we found from the legislative history that Congress imposed exclusive jurisdiction because of a desire to avoid the presentation of wrongful-death claims to juries, that might support an inference that Congress meant to forbid nonstatutory maritime actions for wrongful death, which might come before state or federal juries. Cf. *Fitzgerald* v. *United States Lines,* 374 U. S. 16 (1963). However, that is not the case. The only discussion of exclusive jurisdiction in the legislative history is found in the House floor debates, during the course of which Representative Volstead, floor manager of the bill and chairman of the Judiciary Committee, told the members that exclusive jurisdiction would follow necessarily from the fact that the Act would be part of the federal maritime law. 59 Cong. Rec. 4485. This erroneous view disregards the "saving clause" in 28 U. S. C. § 1333, and the fact that federal maritime law is applicable to suits brought in state courts under the permission of that clause. See n. 1, *supra.* When asked whether it was true that jury trials would never be available in suits under the Act, Representative Volstead replied: "I do not think so. Perhaps, for certain purposes, under the practice that prevails, they may have a jury, but ordinarily a jury is not allowed. However, I do not know much about admiralty practice." 59 Cong. Rec. 4485. From this we can derive no expression of policy bearing on the matter under discussion.

Jones Act almost simultaneously with the Death on the High Seas Act. As we observed in *Gillespie* v. *United States Steel Corp.*, 379 U. S. 148, 155 (1964), the Jones Act was intended to achieve "uniformity in the exercise of admiralty jurisdiction" by giving seamen a federal right to recover from their employers for negligence regardless of the location of the injury or death. That strong concern for uniformity is scarcely consistent with a conclusion that Congress intended to *require* the present nonuniformity in the effectuation of the duty to provide a seaworthy ship. Our recognition of a right to recover for wrongful death under general maritime law will assure uniform vindication of federal policies, removing the tensions and discrepancies that have resulted from the necessity to accommodate state remedial statutes to exclusively maritime substantive concepts. *E. g., Hess* v. *United States,* 361 U. S. 314 (1960); *Goett* v. *Union Carbide Corp.,* 361 U. S. 340 (1960).[15] Such uni-

---

[15] The incongruity of forcing the States to provide the sole remedy to effectuate duties that have no basis in state policy is highlighted in this case. The Florida Supreme Court ruled that the state wrongful-death act was concerned only with "traditional common-law concepts," and not with "concepts peculiar to maritime law such as 'unseaworthiness' and the comparative negligence rule." It found no reason to believe that the Florida Legislature intended to cover, or even considered, the "completely foreign" maritime duty of seaworthiness. 211 So. 2d, at 164, 166. Federal law, rather than state, is the more appropriate source of a remedy for violation of the federally imposed duties of maritime law. Cf. Hill, The Law-Making Power of the Federal Courts: Constitutional Preemption, 67 Col. L. Rev. 1024 (1967); Note, The Federal Common Law, 82 Harv. L. Rev. 1512, 1523–1526 (1969).

It is worth noting that this problem of lack of congruence between maritime duties and state remedies was not presented in *The Harrisburg.* The problem there was that the relevant state statutes of limitations had run, and petitioner sought a federal remedy to which they would not be applicable. The Court did not discuss the standards of behavior comprehended by the state law or by

formity not only will further the concerns of both of the 1920 Acts but also will give effect to the constitutionally based principle that federal admiralty law should be "a system of law coextensive with, and operating uniformly in, the whole country." *The Lottawanna,* 21 Wall. 558, 575 (1875).

We conclude that the Death on the High Seas Act was not intended to preclude the availability of a remedy for wrongful death under general maritime law in situations not covered by the Act.[16]   Because the refusal of mari-

---

maritime law, and nothing indicates that the state law was not wholly adequate to vindicate substantive maritime policies in a suit brought within the state-prescribed period.   Cf. *McAllister* v. *Magnolia Petroleum Co.,* 357 U. S. 221 (1958).

[16] Respondents purport to find such a preclusive intent in two other federal statutes in related areas, the National Parks Act, 16 U. S. C. § 457, and the Outer Continental Shelf Lands Act, 43 U. S. C. §§ 1331–1343.   The former provides: "In the case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be . . . ."   Although Judge Learned Hand once suggested that this statute applied to admiralty, *Puleo* v. *H. E. Moss & Co.,* 159 F. 2d 842, 845 (1947), he quickly reconsidered, *Guerrini* v. *United States,* 167 F. 2d 352, 355 (1948), and it now seems clear that it does not.   See *The Tungus* v. *Skovgaard,* 358 U. S., at 609 n. 9 (separate opinion of BRENNAN, J.); cf. *Rodrigue* v. *Aetna Cas. & Sur. Co.,* 395 U. S. 352 (1969).   The congressional decision to place under state laws such areas as national parks, which are carved from existing state territories and are subject to no other general body of law, carries no implication of a similar intent in the vastly different realm of admiralty.

The latter statute was before this Court in *Rodrigue* v. *Aetna Cas. & Sur. Co., supra.*   We there determined that the Act was intended to treat artificial islands, located beyond the three-mile limit, not as vessels upon the high seas, but "as though they were federal enclaves in an upland State."   Because the Act "deliberately eschewed the application of admiralty principles to these

time law to provide such a remedy appears to be jurisprudentially unsound and to have produced serious confusion and hardship, that refusal should cease unless there are substantial countervailing factors that dictate adherence to *The Harrisburg* simply as a matter of *stare decisis.* We now turn to a consideration of those factors.

## IV

Very weighty considerations underlie the principle that courts should not lightly overrule past decisions. Among these are the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments. The reasons for rejecting any established rule must always be weighed against these factors.

The first factor, often considered the mainstay of *stare decisis,* is singularly absent in this case. The confidence of people in their ability to predict the legal consequences of their actions is vitally necessary to facilitate the planning of primary activity and to encourage the settlement of disputes without resort to the courts. However, that confidence is threatened least by the announcement of a new remedial rule to effectuate well-established primary rules of behavior. There is no

___

novel structures," *id.,* at 355, they were held subject to the substantive standards of state law except when an inconsistent federal law applied. This special dispensation for a modern problem to which maritime law was thought "inapposite," *id.,* at 363, has no analogue in this case. It is undisputed that the duties owed by respondents to petitioner's husband were determined by maritime law, and were the same within as without the three-mile limit.

question in this case of any change in the duties owed by shipowners to those who work aboard their vessels. Shipowners well understand that breach of the duty to provide a seaworthy ship may subject them to liability for injury regardless of where it occurs, and for death occurring on the high seas or in the territorial waters of most States. It can hardly be said that shipowners have molded their conduct around the possibility that in a few special circumstances they may escape liability for such a breach. Rather, the established expectations of both those who own ships and those who work on them are that there is a duty to make the ship seaworthy and that a breach of that federally imposed duty will generally provide a basis for recovery. It is the exceptional denial of recovery that disturbs these expectations. "If the new remedial doctrine serves simply to reenforce and make more effectual well-understood primary obligations, the net result of innovation may be to strengthen rather than to disturb the general sense of security." Hart & Sacks, *supra,* at 577; *id.,* at 485, 574–577, 585–595, 606–607; Pound, Some Thoughts About Stare Decisis, 13 NACCA L. J. 19 (1954).

Nor do either of the other relevant strands of *stare decisis* counsel persuasively against the overruling of *The Harrisburg.* Certainly the courts could not provide expeditious resolution of disputes if every rule were fair game for *de novo* reconsideration in every case. However, the situation we face is far removed from any such consequence as that. We do not regard the rule of *The Harrisburg* as a closely arguable proposition—it rested on a most dubious foundation when announced, has become an increasingly unjustifiable anomaly as the law over the years has left it behind, and, in conjunction with its corollary, *The Tungus,* has produced litigation-spawning confusion in an area that should be easily susceptible of more workable solutions. The rule has

had a long opportunity to prove its acceptability, and instead has suffered universal criticism and wide repudiation. To supplant the present disarray in this area with a rule both simpler and more just will further, not impede, efficiency in adjudication. Finally, a judicious reconsideration of precedent cannot be as threatening to public faith in the judiciary as continued adherence to a rule unjustified in reason, which produces different results for breaches of duty in situations that cannot be differentiated in policy. Respect for the process of adjudication should be enhanced, not diminished, by our ruling today.[17]

## V

Respondents argue that overruling *The Harrisburg* will necessitate a long course of decisions to spell out the elements of the new "cause of action." We believe these fears are exaggerated, because our decision does not require the fashioning of a whole new body of federal law, but merely removes a bar to access to the existing

---

[17] Respondents point out that a bill has been introduced in the United States Senate, by request, which would, among other things, extend the Death on the High Seas Act to include deaths in state territorial waters. S. 3143, 91st Cong., 1st Sess. To date no hearings have been scheduled or other action taken on the bill. The mere possibility of future legislation in this field does not, of course, affect the legal merits of petitioner's claim that the rule of *The Harrisburg* is no longer a valid part of maritime law. See *United States* v. *W. M. Webb, Inc.*, 397 U. S. 179, 194 n. 21 (1970).

Nor do we think that Congress' failure to take action on the pending bill, or to pass a similar measure over the years as the law of deaths on territorial waters became more incongruous, provides guidance for the course we should take in this case. To conclude that Congress, by not legislating on this subject, has in effect foreclosed, by negative legislation as it were, reconsideration of prior judicial doctrine would be to disregard the fact that "Congress has largely left to this Court the responsibility for fashioning the controlling rules of admiralty law." *Fitzgerald* v. *United States Lines Co.*, 374 U. S. 16, 20 (1963).

general maritime law. In most respects the law applied in personal-injury cases will answer all questions that arise in death cases.

Respondents argue, for example, that a statute of limitations must be devised or "borrowed" for the new wrongful-death claim. However, petitioner and the United States respond that since we have simply removed the barrier to general maritime actions for fatal injuries, there is no reason—in federal admiralty suits at least [18]—that such actions should not share the doctrine of laches immemorially applied to admiralty claims. In applying that doctrine, the argument runs, the courts should give consideration to the two-year statute of limitations in the Death on the High Seas Act,[19] just as they have always looked for analogy to appropriate state or foreign statutes of limitations. See *Kenney* v. *Trinidad Corp.*, 349 F. 2d 832, 840 (C. A. 5th Cir. 1965); Gilmore & Black, *supra,* at 296 n. 149, 628. We need not decide this question now, because the present case was brought within a few months of the accident and no question of timeliness has been raised. The argument demonstrates, however, that the difficulties should be slight in applying accepted maritime law to actions for wrongful death.

The one aspect of a claim for wrongful death that has no precise counterpart in the established law governing nonfatal injuries is the determination of the beneficiaries who are entitled to recover. General maritime law, which denied any recovery for wrongful death, found no need to specify which dependents should receive such recovery. On this question, petitioner and the United States argue that we may look for guidance to the expressions of Congress, which has spoken on this

---

[18] See *McAllister* v. *Magnolia Petroleum Co.*, 357 U. S. 221, 224 (1958).

[19] 46 U. S. C. § 763.

subject in the Death on the High Seas Act,[20] the Jones Act,[21] and the Longshoremen's and Harbor Workers' Compensation Act.[22] Though very similar, each of these provisions differs slightly in the naming of dependent relatives who may recover and in the priority given to their claims.

The United States contends that, of the three, the provision that should be borrowed for wrongful-death actions under general maritime law is that of the Death on the High Seas Act. It is the congressional enactment that deals specifically and exclusively with actions for wrongful death, and that simply provides a remedy—for deaths on the high seas—for breaches of the duties imposed by general maritime law. In contrast, the beneficiary provisions of the Jones Act are applicable only to a specific class of actions—claims by seamen against their employers—based on violations of the special standard of negligence that has been imposed under the Federal Employers' Liability Act. That standard appears to be unlike any imposed by general maritime law. Further, although the Longshoremen's and Harbor Workers' Compensation Act is applicable to longshoremen such as petitioner's late husband, its principles of recovery are wholly foreign to those of general maritime law—like most workmen's compensation laws, it deals only with the responsibilities of employers for death or injury to their employees, and provides standardized amounts of compensation regardless of fault on the part of the employer.

The only one of these statutes that applies not just to a class of workers but to any "person," and that bases liability on conduct violative of general maritime

---

[20] 46 U. S. C. §§ 761, 762.

[21] 45 U. S. C. § 51; see 46 U. S. C. § 688.

[22] 33 U. S. C. § 909. See n. 11, *supra.*

law, is the Death on the High Seas Act.[23]   The borrowing
of its schedule of beneficiaries, argues the United States,
will not only effectuate the expressed congressional pref-
erences in this area but will also promote uniformity by
ensuring that the beneficiaries will be the same for identi-
cal torts, rather than varying with the employment status
of the decedent.   There is no occasion, according to this
argument, to borrow from the law of the relevant coastal
State, since the underlying duties to be effectuated are
entirely federal and Congress has expressed its preference
of beneficiaries for violations of maritime law.

We do not determine this issue now, for we think its
final resolution should await further sifting through the
lower courts in future litigation.   For present purposes
we conclude only that its existence affords no sufficient
reason for not coming to grips with *The Harrisburg.*   If
still other subsidiary issues should require resolution, such
as particular questions of the measure of damages, the
courts will not be without persuasive analogy for guid-
ance.   Both the Death on the High Seas Act and the
numerous state wrongful-death acts have been imple-
mented with success for decades.   The experience thus
built up counsels that a suit for wrongful death raises no
problems unlike those that have long been grist for the
judicial mill.

In sum, in contrast to the torrent of difficult litigation
that has swirled about *The Harrisburg, The Tungus,*
which followed upon it, and the problems of federal-state
accommodation they occasioned, the recognition of a
remedy for wrongful death under general maritime law
can be expected to bring more placid waters.   That pros-
pect indeed makes for, and not against, the discarding of
*The Harrisburg.*

---

[23] 46 U. S. C. § 761.

We accordingly overrule *The Harrisburg,* and hold that an action does lie under general maritime law for death caused by violation of maritime duties. The judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.