Dorothy M. PREVATT, Plaintiff,

v.

M/V DIANA, etc., and Companhia De
Navagacco Maritima Netumar,
etc., Defendants.

Civ. No. 70–666.

United States District Court,
M. D. Florida,
Jacksonville Division.

March 2, 1971.

S. Perry Penland, Jacksonville, Fla.,
for plaintiff.

Harold B. Wahl, Loftin & Wahl, Jacksonville, Fla., for defendants.

## FINDINGS OF FACT
## AND
## CONCLUSIONS OF LAW

WILLIAM A McRAE, Jr., District
Judge.

After plaintiff had brought two suits
in the State Court, the first on October
30, 1969, and the second on May 6, 1970,
both of which were dismissed, she
brought a suit in rem in this Court
against the vessel and in personam
against its owner.

Plaintiff alleges that on or about August 23, 1969, the Motor Vessel DIANA
collided with a small boat in the St.
Johns River near Jacksonville, Florida;
that the DIANA was negligently operated either into collision with the small
boat, or, in the alternative, so close to
the small boat as to throw or wash
plaintiff's deceased husband overboard,
as a result of which he drowned.

Defendants filed Answer, including
the defenses that the complaint failed to
state a claim upon which relief could be
granted, that there was no liability, and
that the accident was solely attributable
to the negligence of plaintiff's deceased
husband.

After trial held January 13, 1971, the
Court makes the following Findings of
Fact and Conclusions of Law:

### *Findings of Fact*

1. The only eye witness who testified
was the compulsory bar pilot, William A.

Allbritten, who was put on as an adverse witness by plaintiff and who testified at great length. He was pilot on the Motor Vessel DIANA, a Brazilian freighter, 490 feet long and 65 feet wide. He testified, and the Court finds, that as the Motor Vessel DIANA came down the St. Johns River channel headed towards the sea shortly after 7:00 P. M. on August 23, 1969, in bad weather, with a northeaster blowing and with winds up to 30 to 35 knots, but with visibility a mile or more, he observed three small boats some distance away in the same general area as Pirate's Cove Fish Camp; that as he approached closer and came around the bend into Short Cut Turn approaching Buoy No. 27, he saw that two of the boats were up against the shore some distance away, but that one of them appeared to be in the channel; that a man was standing in the small boat and the boat was apparently headed toward the north shore. The pilot blew five blasts to alert the small boat to the presence of the DIANA, slowed down his vessel, and as he came around the bend in the river, he cut as far to his starboard side as possible. The DIANA was only making safe steerageway at the time he blew five blasts signal, and the pilot testified that since the man was in the middle of the channel with his bow heading to the north shore and in no apparent danger, there was ample room for the DIANA to pass with sufficient clearance between the small boat on the port side and Buoy No. 25 on the right side. He kept the small boat in view and the small boat was well off his port bow. The small boat momentarily disappeared under the bow as the vessel came around the bend in the river, but then re-appeared, still well off the bow. The man left the small boat and was swimming in the water, but as the pilot watched him, he swam back to the small boat and was climbing back into it at the time the vessel passed him, and the small boat was abaft the stern. Upon seeing the man in the water, the pilot cut off his engines and steadied the vessel so that the propellors could not do any damage. He did not re-start the engines until the vessel was well clear astern. The pilot testified that there was very little wash from the DIANA, and that the waves from the wind were much higher than anything produced by the DIANA. The pilot went back to the starboard side of the vessel to be sure that he had cleared the next buoy, Buoy No. 25. About that time, he was advised by the Master that the man had left the small boat again and was swimming toward shore. Whereupon, the pilot returned to the port side of the bridge. He was unable to locate the man or the boat, and he telephoned the Pilot Station that a man had jumped overboard from a small boat and he requested that the Coast Guard and Pirate's Cove Fish Camp be asked for help in locating him. The pilot then anchored the DIANA out of the channel and well below Buoy No. 25 awaiting the arrival of the Coast Guard boat which arrived in a few minutes.

2. The deceased, W. Winston Prevatt, was a friend of Charles G. Skidmore, the owner of Pirate's Cove Fish Camp, and plaintiff, Mrs. Prevatt, worked there. On the afternoon in question, Prevatt had borrowed a motor and was planning, when the weather cleared, to retrieve some fishing boats which had not been returned to the camp. No one saw him immediately before he left the camp or when he left the camp in the boat, and his absence was not discovered until some time after the accident, presumably either by the Coast Guard or the Pilot Station advising the camp that a man had jumped from a small boat into the river and was missing. No one knew exactly when or why Prevatt left the camp and got out into the river channel, but presumably he was trying to retrieve fishing boats. Although no one knew he had left shore until after the accident, a man was seen in a boat out in the river channel, and the Court finds that this man was Prevatt. The channel was 480 feet wide at this point.

3. Prevatt, although standing in the boat, gave no distress signal. The pilot

thought he was either rowing the boat, steering the boat, or working with the engine. The bow of the boat was headed towards the north shore and the pilot took it that he was heading in that direction. There was testimony, and the Court finds, that the motor was in excellent operating condition, although it was too light for a 14-foot boat in this weather, particularly if he were going to retrieve a second boat.

4. The pilot said he never saw but one boat. He says that if there were two boats, one was so close alongside the other that it appeared to be one boat.

5. When Prevatt's body was discovered some three days later, washed some considerable distance up the river, he had on a yellow raincoat buttoned up, and was dressed, including work shoes.

6. Captain Vernon A. Davis (with 23 years experience as a St. Johns River bar pilot) was the pilot on a tanker coming up river about this same time on August 23, 1969. He heard over his radio that a man was missing from a small boat, and as he came up the river, he and the crew of the tanker were on the lookout for a man or small boat. As they passed Fort Caroline fort, a mile or a mile and a half from Pirate's Cove, he saw two small boats bobbing up and down against the rocks about 200 feet apart. He reported this, and some time later the Coast Guard found the two boats at this location. There was nothing in one of the boats, but the boat with the motor which had been occupied by Prevatt contained Prevatt's glasses, an oar, and four life preservers. Both boats were still right side up and there was no indication either had turned over.

7. Captain Davis testified, and the Court finds that it was not safe for a small open boat to venture out into the St. Johns River channel at the time and place and under the weather conditions then existing. The Court finds that the negligence of plaintiff's decedent in so doing, particularly with a buttoned-up raincoat and dressed, with shoes, and his failure to exercise due care and caution for his safety, were the principal cause of his death.

8. There was testimony from plaintiff's witnesses, photographs were introduced, and the Court finds that, there was some damage to each of the small boats and to the motor, although the damage was not serious. There was also some black paint or grease on certain portions of the small boats. Both Captain Davis and plaintiff's witness Skidmore, owner of the fish camp, testified that the buoys on the south side of the river were painted black, and the buoys on the north side of the river were painted red, the pilings in the area were black, and rocks had black on them.

9. It was stipulated that other witnesses would testify to the same general effect as Skidmore.

10. One Carl L. Wilson, Jr., whose identity was not revealed until just prior to hearing on summary judgment, testified that he was parked that evening on a road near Pirate's Cove; that he saw a large vessel (presumably the DIANA) headed straight toward him; that he saw a "blue" boat bobbing in the water apparently attached to the vessel's bow. He only saw the one "blue" boat. The boat he saw had no one in it, and there was no engine on the boat, so it was not the boat in which Prevatt was riding. The boats recovered were not blue. The photographs show them to be white.

11. The Court finds that pilot Allbritten was in charge of the navigation of the M/V DIANA; that he was aware of the presence of the small boat in which decedent was riding for a considerable distance; that although he exercised care and caution, cut to the right of the channel, and slowed down, yet he continued his course, without slowing down as much as he might have done, knowing that the bow of the vessel would pass within approximately 100 feet or less of the decedent if decedent's boat remained stationary; that despite the negligence of plaintiff's deceased husband, yet it is possible that either the wake of the vessel or its bow came into contact with the small boat and

caused decedent either to jump or to be thrown overboard into the river. There were dents in the left side of decedent's small boat which could have been caused by the M/V DIANA, or by the rocks, pilings, buoys, or the other small boat.

12. The autopsy report of the Medical Examiner shows that Prevatt came to his death by probable drowning and there was no evidence of trauma.

13. The ship's log, prepared not by the bar pilot but by the officers of the DIANA, was introduced into evidence. The log entries are in substantial accord with the pilot's testimony.

14. The pilot testified that there were one or two men on the bow of the DIANA who were performing no other duties than lookout, that he did not receive any advices from them as to the small boat, but that he needed none, as the bridge was some 30 feet above the level of the deck and he had all the view of the small boat that was necessary.

15. After the pilot had the Coast Guard called, he anchored the vessel a little downstream awaiting the Coast Guard vessel. When the Coast Guard arrived, the pilot reported the facts, where the man and his boat had been last seen, and the Coast Guard authorized him to proceed to sea. When he attempted to proceed, the DIANA went aground, being borne against a shoal by the current, winds, and waves. It was refloated at high tide the next day.

16. Had the pilot attempted to stop completely, the DIANA, as it came around the bend in the river at Buoys Nos. 27 and 25, the vessel and the lives aboard the vessel would have been endangered and the vessel, without steerageway, would probably have gone aground by the action of the current, wind and waves. The pilot testified he would ordinarily have kept much closer to the center of the channel, but on this occasion he came as far to the right as possible and barely cleared Buoy No. 25. Although the river itself was much wid-

er, the ship channel was 480 feet wide at the point in question.

17. The Court finds that although the DIANA was operated with care and caution, yet it kept its course and it might have slowed down somewhat more; that decedent's negligence, in going out into the St. Johns River channel in that bad weather at that time, and in failing to exercise due care and caution for his own safety, was the principal cause of his death; that under the principle of comparative negligence, the negligence of plaintiff's decedent contributed 90% to his death; that of the pilot of the vessel 10%.

### Conclusions of Law

1. This Court has jurisdiction of the parties and of the subject matter. Since the vessel was being navigated by a compulsory pilot, the plaintiff has a cause of action against the vessel in rem, but not against the owner. See Baer on Admiralty Law of the Supreme Court, Second Edition, Sec. 13.1; 48 Am.Jur., Shipping, Sec. 536; 29A Fla. Jur. 454, 457, and cases cited.

2. The rule of comparative negligence applies here. See Moragne v. States Marine (June 15, 1970) 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339; 71 A.L.R.2d 1319; Ahlgreen v. Red Star (C.A.2) 214 F.2d 618, 1954 A.M.C. 1504; Norris' The Law Of Seamen, Third Edition, Volume 2, Sec. 630; and Baer's Admiralty Law Of The Supreme Court, Second Edition, pages 86 and 163.

3. The Court has found that the principal proximate cause of the death of plaintiff's decedent was his own negligence, and that the negligence of the pilot of the vessel contributed 10%.

4. The Court concludes, therefore, to award plaintiff Ten Thousand ($10,000.00) Dollars, with each party standing her or its own costs.

Judgment will be entered into accordance with the above Findings of Fact and Conclusions of Law.