466 F.2d 159
 19 A.L.R.Fed. 167
 Mrs. Geraldine W. GREENE, Administratrix of the Estate of
Robert Greene, Deceased, Appellee,
v.
VANTAGE STEAMSHIP CORPORATION, Appellant.
VANTAGE STEAMSHIP CORPORATION, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 72-1035, 72-1036.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 10, 1972.
Decided Aug. 29, 1972.
 
 Carter B. S. Furr, Norfolk, Va. (Jett, Berkley, Furr & Heilig, Norfolk, Va., on brief), for appellant in No. 72-1035 and No. 72-1036.
 Sidney H. Kelsey, Norfolk, Va. (Kelsey & Kelsey, Norfolk, Va., on brief), for appellee in No. 72-1035.
 William D. Appler, Atty., Department of Justice (L. Patrick Gray, III, Asst. Atty. Gen., and Morton Hollander, Atty., Department of Justice, and Brian P. Gettings, U. S. Atty., on brief), for appellee in No. 72-1036.
 Before WINTER and FIELD, Circuit Judges, and BLATT, District Judge.
 WINTER, Circuit Judge:
 
 
 1
 Robert Greene, a longshoreman employed by the United States at the Naval Supply Center, Norfolk, Virginia, was fatally injured when a hatch board on the SS RACHEL V gave way, causing him to fall to the deck below. The decedent's wife, as administratrix of his estate, instituted this action against Vantage Steamship Corporation (Vantage), owner of the RACHEL V, claiming that Vantage had breached its duty to provide a seaworthy vessel. Vantage then filed a third party action against the stevedore, the United States, alleging that it had breached its implied warranty of workmanlike performance. The district court directed a verdict in favor of the plaintiff on the issue of unseaworthiness and submitted only the question of damages to the jury. It returned a verdict of $100,000. In the third party action, the district court, sitting without a jury, held that the United States had not breached its implied warranty and gave judgment against Vantage. Vantage appeals from the final orders in both causes of action.
 
 
 2
 * On March 19, 1971, Vantage contracted to charter the RACHEL V to the Military Sealift Command.[1] Prior to the delivery of the RACHEL V to the MSC, a joint survey of the ship was conducted.[2] The survey revealed that in the No. 1 hold four hatch boards on the upper 'tween deck were broken, one hatch beam was bowed, and two hatch beams had their underside flanges toed up. After the survey, the ship sailed from Bayonne, New Jersey, to the Naval Supply Center in Norfolk, Virginia, to take on government cargo.
 
 
 3
 The No. 1 hold of the RACHEL V consists of an upper 'tween deck, a lower 'tween deck, and a lower hold. The 'tween deck hatch squares contained the standard type of hatch boards laid over hatch beams. The hatch beams run athwartship and the hatch boards fit between the beams, resting on a three to four inch lip of the beam. The district court did not make a specific finding with reference to the number of hatch beams, noting only that it "appears there were five or six hatch beams and six or seven rows of hatch boards."On the morning of April 3, 1971, Robert Greene was a member of a longshoreman gang assigned to prepare the RACHEL V to take on cargo in her No. 1 hold. His immediate supervisor was Chambers, the gang boss, who, in turn, was under the supervision of Nesbit, the stevedore supervisor. The cargo was to be loaded into the lower hold, and therefore it was necessary to open the hatch squares on the two upper decks. After the main deck hatch cover was removed, Nesbit and Chambers examined the hatch boards on the upper 'tween deck. Some of the hatch boards in the forward end of the hatch were in disarray and some were missing. The boards in the aft end, however, appeared to be in proper order; and since this was the area in which the men were scheduled to work, the order to proceed was given.
 
 
 4
 The decedent and his co-worker, Avery, descended to the upper 'tween deck to remove the hatch boards. As was their custom, the men began removing the hatch boards from the middle part of the hatch. Greene walked to the middle of the row, picked up a hatch board, turned to carry it to the edge or crowl of the ship, when the board on which he was standing gave way causing him to fall to the lower 'tween deck. As the result of his fall, Greene suffered severe injuries from which he died thirty-six hours later.
 
 II
 
 5
 In plaintiff's case against Vantage, the district court directed a verdict in favor of the plaintiff, holding that as a matter of law, the RACHEL V was unseaworthy. The district court also directed a verdict for the plaintiff on the issue of the decedent's contributory negligence. Vantage contends that there was insufficient evidence to take either of these two questions from the jury. We disagree.
 
 
 6
 A ship owner has an absolute duty to provide a "vessel and appurtenances reasonably fit for their intended use." Mitchell v. Trawler Racer, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). Vantage's duty in this case was therefore to supply hatch boards which would support a man in the process of opening up a hold.[3] That Vantage failed to meet its duty is too plain for argument.
 
 
 7
 Whether an issue of alleged unseaworthiness should be submitted to a jury depends on whether "fair minded men, viewing all the facts and the inferences to be drawn from the facts can differ over whether the ship and its gear are reasonably fit for service . . ." Lundy v. Isthmian Lines, Inc., 423 F.2d 913, 915 (4 Cir. 1970). Here, plaintiff established that the hatch boards in the area where the decedent was working appeared to be in proper order, that there were no visible defects, and that the hatch board on which the decedent was standing slipped off the hatch beams causing him to fall to the lower 'tween deck. Since this evidence was uncontradicted, we agree with the district court that fair minded men viewing the facts and the logical inferences to be drawn from them could only conclude that the vessel was unseaworthy.
 
 
 8
 Vantage contends, however, that before a case can be taken from the jury, it is necessary for the plaintiff to show how or why the board upended, i. e., that it was too short or that the hatch beam was bowed, etc. Vantage misconstrues the plaintiff's burden of proof on the question of unseaworthiness. In Oliveras v. American Export Isbrandtsen Lines, Inc., 431 F.2d 814 (2 Cir. 1970), a sliding door held open by a wedge and hook slid shut injuring a seaman's hand. No proof was offered why the door slid shut. On the basis of this evidence, the jury returned a verdict in favor of the ship owner. On appeal the second circuit reversed, holding that the seaman was entitled to a directed verdict despite the fact that he had failed to show why the door slammed shut:
 
 
 9
 Nothing more need be shown except that the device in question failed under conditions when it should have functioned properly. On the issue of the ship's unseaworthiness it is of no moment to speculate as to why the hook and wedge, fittings intended to keep the sliding door open, failed to function.
 
 
 10
 Id. at 816.
 
 
 11
 Where an appliance or piece of equipment breaks or fails in the normal course of use, a plaintiff need not show why the failure occurred, but only that it did occur with the resulting injury. See Oliveras v. American Export Isbrandtsen Lines, Inc., supra; Gibbs v. Kiesel, 382 F.2d 917 (5 Cir. 1967); Vega v. The Malula, 291 F.2d 415 (5 Cir. 1961); see also Petterson v. Alaska S.S. Co., 205 F.2d 478 (9 Cir.) aff'd 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); Satchell v. Svenska Ostasiatiska Kompaniet, 385 F.2d 76 (4 Cir. 1967).
 
 
 12
 Nor is there merit in Vantage's argument that the issue of contributory negligence should have been permitted to go to the jury. "The admiralty rule is that the defense of contributory negligence must be affirmatively pleaded and proved by the defendant." W. E. Hedger Transp. Corp. v. United Fruit Co., 198 F.2d 376, 379 (2 Cir.) cert. denied 344 U.S. 896, 73 S.Ct. 275, 97 L.Ed. 692 (1952). Vantage offered no evidence to show that the decedent knew or should have known that the hatch boards were unsafe.[4] Moreover, plaintiff's witnesses, who observed the hatch boards prior to the accident, testified that the boards in the aft end of the upper 'tween deck appeared safe and that there was no space between the boards and the flanges of the hatch beams. In light of the evidence presented by both parties, we conclude that the district court correctly directed a verdict for the plaintiff on the issue of contributory negligence.
 
 III
 
 13
 Vantage seeks to set aside the jury's award of $100,000 on the ground that the district court erred in instructing the jury on the issue of damages. The district court instructed the jury that they could award damages for the plaintiff's pecuniary loss, her grief and mental anguish, the decedent's pain and suffering prior to his death, and funeral expenses. Vantage contends that damages for a wrongful death in general maritime law are limited to pecuniary loss.
 
 
 14
 In Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L. Ed.2d 339 (1970), the Supreme Court overruled The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886) and held that general maritime law affords a cause of action for wrongful death.[5] The Court declined to specify the measure of damages in such an action, preferring instead to defer that issue for "further sifting through the lower courts in future litigation." Id. at 408, 90 S.Ct. at 1792. The Court did note, however, that the lower courts would not be without persuasive analogy for guidance. "Both the Death on the High Seas Act and the numerous state wrongful-death acts have been implemented with success for decades." Id.
 
 
 15
 The basis for Vantage's argument that damages for this new cause of action are limited to pecuniary loss is the principle that general maritime law be uniform. In 1920, Congress passed the Death on the High Seas Act, 46 U.S.C.A. Sec. 761 et seq. [hereinafter DOHSA], which provided a cause of action for wrongful death occurring on the high seas. Damages under the DOHSA are limited to pecuniary loss. Since this new Moragne cause of action is most analogous to the existing DOHSA, Vantage argues that the doctrine of uniformity requires that we adopt the same measure of damages for wrongful death under general maritime law as is presently provided by DOHSA.
 
 
 16
 Vantage's position is not without support. In Petition of United States Steel Corporation, 436 F.2d 1256 (6 Cir. 1970), cert. denied Lamp v. United States Steel Corp., 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153, reh. denied Fuhrman v. United States Steel Corp., 403 U.S. 924, 91 S.Ct. 2227, 29 L.Ed.2d 703 (1971), the court reversed a district court award for a wrongful death occurring on territorial waters which included damages for loss of consortium, loss of love, and loss of companionship and guidance to the adult emancipated children, elements of loss, all of which were compensable under the Michigan Wrongful Death Act. The court held that since those items of damages conflicted with those provided under the general maritime law, the state law must give way to the federal. It should be noted, however, that the court did not specifically state what was the measure of damages under general maritime law. Similarly, in Simpson v. Knutsen, 444 F.2d 523, 524, 525 (9 Cir. 1971), the court held that the "District Court did not err in refusing to award damages for loss of consortium . . .," but again there was no discussion of what constituted the proper measure of damages. Presumably, both the sixth and ninth circuits felt that the proper measure was that embodied in DOHSA.
 
 
 17
 In contrast to these decisions, the court, in Dennis v. Central Gulf Steamship, 453 F.2d 137 (5 Cir. 1972), permitted the plaintiff in a wrongful death case under general maritime law to recover for the decedent's pain and suffering and for funeral expenses. The court rejected the argument that the doctrine of uniformity required that damages be limited to those provided by DOHSA. The court stated that the " 'uniformity' that is fundamental in maritime law has to do with the bases of liability, not with differing elements of damages that may be recoverable in differing circumstances with differing classes of beneficiaries." Id. at 140. We agree that Moragne was concerned with establishing a uniform basis of liability for wrongful death occurring on territorial waters, but that that decision should not be read as requiring that damages for this new cause of action be controlled by DOHSA.[6]
 
 
 18
 The doctrine of uniformity, as a constitutional doctrine, is inapplicable to the issue of damages under Moragne.[7] The doctrine, first enunciated in Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), holds that a state law is invalid "where it actually conflicts with the general maritime law or federal statutes."[8] Gilmore and Black, The Law of Admiralty Secs. 1-17 (1957). Here there is no conflict between state and federal law, because as yet there is no federal law on the issue. The task of deciding damages for wrongful death under general maritime law was left, in the first instance, to the lower federal courts. Moragne v. States Marine Lines, Inc., supra, 398 U.S. at 408, 90 S.Ct. 1772, 26 L.Ed.2d 339. And, in directing the lower courts to make this initial determination, the court suggested that reference be made not only to the existing federal statutes, but also to the numerous state wrongful death statutes. Our task, then, is not to apply "state law" or "federal law," but to decide the most appropriate measure of damages for this new cause of action.
 
 
 19
 The approach of the court in Moragne, in concluding that general maritime law affords a cause of action for wrongful death, should be used to determine the proper measure of damages. In holding that general maritime law provides recovery for wrongful death, the Court was influenced by the fact that every jurisdiction had enacted a wrongful death statute. The significance of that fact was that wrongful death had become part of the common law:
 
 
 20
 These numerous and broadly applicable statutes, taken as a whole, make it clear that there is no present public policy against allowing recovery for wrongful death . . . . This legislative establishment of policy carries significance beyond the particular scope of each of the statutes involved. The policy thus established has become itself a part of our law, to be given its appropriate weight not only in matters of statutory construction but also in those of decisional law.
 
 
 21
 . . . It has always been the duty of the common law court to perceive the impact of major legislative innovations and to interweave the new legislative policies with the inherited body of common-law principles-many of them deriving from earlier legislative exertions.
 
 
 22
 Moragne v. States Marine Lines, Inc., supra, 398 U.S. at 390-392, 90 S.Ct. at 1782. So, in this case also, this body of law must be examined to determine what the proper measure of damages should be. In examining state wrongful death statutes, we do not give them preference over federal law, but rather we view them as indicators of what has come to be the accepted measure of damages in such actions. Of course, in so doing, we do not undertake to define all of the elements of damages for wrongful death under general maritime law. Rather, we consider only what is presented by this case-whether recovery can be had for the decedent's pain and suffering, funeral expenses, and the plaintiff's grief and mental anguish.
 
 
 23
 Damages for the decedent's pain and suffering are not ordinarily awarded in wrongful death actions. Only nine statutes permit recovery for the decedent's pain and suffering, but two of these are federal, the Federal Employers' Liability Act, 45 U.S.C.A. Secs. 51-59, and the Jones Act, 46 U.S.C.A. Sec. 688.[9] See Comment, "Wrongful Death Damages in North Carolina," 44 N.C.L.Rev. 402 (1966). The majority of states, however, permit recovery for pain and suffering under survival statutes. Despite the fact that pain and suffering of a decedent are not usually compensated under wrongful death statutes, several considerations dictate that recovery for this element of damage be permitted under a Moragne cause of action.
 
 
 24
 Maritime law permits recovery for pain and suffering. Dennis v. Central Gulf Steamship Corp., supra, 453 F.2d at 140; Downie v. United States Lines Co., 359 F.2d 344, 347 (3 Cir.) cert. denied 385 U.S. 897, 87 S.Ct. 201, 17 L. Ed.2d 130 (1966); Heredia v. Davies, 12 F.2d 500, 501 (4 Cir. 1926). Traditionally, however, recovery has been denied where the seaman dies of his injuries. Cortes v. Baltimore Insular Line, 287 U.S. 367, 371, 53 S.Ct. 173, 77 L.Ed. 368 (1932) (dictum). The basis for this rule is the now outmoded felony merger doctrine,[10] a doctrine which has no place in contemporary jurisprudence (Cf. Moragne v. States Marine Lines, Inc., supra, 398 U.S. at 379-387, 90 S.Ct. 1772), as evidenced by the numerous statutes, both state and federal, which have abrogated the rule. In light of the Court's holding and discussion in Moragne, we do not believe that the dictum in Cortes is still controlling. The same rationale which the Court used to overturn the Harrisburg is equally, if not more, applicable to the recognition of the right to recover for the decedent's pain and suffering prior to his death, especially since what is involved is not the creation of a new cause of action as in Moragne, but only removal of an archaic bar to the bringing of a traditional admiralty suit.
 
 
 25
 In the great majority of states, a plaintiff could join with his Moragne action, an action under the state survival statute and in that way recover for the decedent's pain and suffering.[11] But to require the institution and joinder of separate suits would be to create different recoveries for a breach of the same duty since not every state has a survival action and, in those that do the statutes may differ.[12] By failing to include the decedent's pain and suffering as a part of the recovery under the general maritime law, we would force plaintiffs to rely on divergent state statutes for a duty entirely federal in nature. Relief, then, would depend solely on the "fortuitous circumstances of location." See generally, Note, "Maritime Wrongful Death After Moragne: The Seamen's Legal Lifeboat," 50 Geo.L.J. 1411, 1434-1437 (1971).
 
 
 26
 Finally, we do not believe that the Moragne decision was intended to narrow the relief available for wrongful death. Dennis v. Central Gulf Steamship, supra, 453 F.2d at 140. Yet, this would be the result if recovery were limited to pecuniary loss since under the state statutes used prior to Moragne, recovery was usually broader than provided by DOHSA. We believe that it is more consistent with the spirit of admiralty law to permit recovery for pain and suffering than to deny it. "'[C]ertainly it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established inflexible rules."' Moragne v. State Marine Lines, Inc., supra, 398 U.S. at 387, 90 S.Ct. at 1781, 26 L.Ed. 2d 339, quoting from the Sea Gull, 21 F. Cas.P. 909 (No. 12,578) (CC Md.1865). We hold therefore that in a wrongful death action under general maritime law, recovery may be had for decedent's pain and suffering.
 
 
 27
 We also hold funeral expenses are a proper element of recovery. Although none of the federal statutes permit such a recovery, the majority of states do. Perhaps more significant is the fact that prior to the Harrisburg, recovery of funeral expenses was permitted under general admiralty law. See Keene v. The David Reeves, 12 F.Cas.P. 386 (No. 6,625) (D.Md.1879). "The overruling of The Harrisburg revives those cases as guides for decision here." Dennis v. Central Gulf Steamship Corp., 323 F. Supp. 943, 950 (E.D.La.1971) aff'd 453 F.2d 137 (1972). In many instances funeral expenses represent out-of-pocket expenses to the beneficiaries of the wrongful death action and hence, in a broad sense, these expenses may be viewed as pecuniary losses.
 
 
 28
 The strongest argument in favor of denying these items of recovery, and limiting recovery to pecuniary loss, is the existence of DOHSA. This act is most analogous to the cause of action created by the Moragne decision. In Moragne, the United States, appearing as an amicus curiae, argued that the new cause of action should follow DOHSA. "It is the congressional enactment that deals specifically and exclusively with actions for wrongful death . . . There is no occasion . . . to borrow from the law of the relevant coastal State, since the underlying duties to be effectuated are entirely federal and Congress has expressed its preference." Moragne v. States Marine Lines, Inc., supra, 398 U.S. at 407, 90 S.Ct. at 1791.
 
 
 29
 While this argument is not without force, we find it unpersuasive in light of the legislative history of DOHSA.[13] In enacting DOHSA, Congress specifically declined to extend its coverage to territorial waters. More significantly, however, Congress permitted the states to provide remedies for wrongful death on territorial waters which were not only diverse, but which in many instances permitted more liberal recovery than the recovery provided under DOHSA. This seems to negate any suggestion that Congress intended to have a uniform remedy or that it opposed the existence of remedies on territorial waters which differed from those provided for death on the high seas.
 
 
 30
 In contrast to recovery for pain and suffering and funeral expenses, only a small number of jurisdictions permit a beneficiary in a wrongful death action to recover for grief and mental anguish. None of the federal statutes permit such a recovery and it is permitted in only a small number of states. "Wrongful Death Damages," supra, 44 N.C.L.Rev. at 411.[14] Since this item of damages has not become generally accepted in wrongful death actions, recovery therefor should not now be permitted in a Moragne cause of action. Because the district court permitted the jury to award part of the damages on the basis of grief and mental anguish, the case must be remanded for a new trial on the issue of damages.
 
 IV
 
 31
 In the third party action, the district court held that the stevedore, the United States, had not breached its warranty of workmanlike performance. Vantage challenges that decision on several grounds. First, Vantage argues that the district court erroneously applied the "cursory inspection" standard instead of the "reasonable inspection" standard. Second, Vantage contends that the stevedore rendered a substandard performance since it failed to make a more detailed inspection of the No. 1 upper 'tween deck after observing that some of the hatch boards in the forward end were missing and in disarray. As a counterpart to that argument, the ship owner contends that the stevedore was required to make a more detailed inspection because of the knowledge it had obtained in the joint survey that four hatch boards were broken, one beam was bowed, and two beams had their underside flanges toed up. Finally, Vantage cites as error the district court's failure to consider whether the stevedore breached its implied warranty by failing to comply with longshoring regulation 29 C.F.R. Sec. 1504.1. We will consider these arguments seriatim.
 
 
 32
 Where a party contracts to provide stevedoring services, he impliedly warrants, even if he has not done so expressly, that those services will be performed properly and safely. Ryan Stevedoring Co. v. Pan-Atlantic SS. Corp., 350 U.S. 124, 133, 76 S.Ct. 232, 100 L.Ed. 133 (1956). This warranty of workmanlike performance is the essence of a stevedoring contract. Id. A vessel may be rendered unseaworthy by a stevedore's breach of his warranty; and in such a case, the ship owner may recover indemnity from the stevedore. Even if the vessel is unseaworthy in the first instance, the ship owner may recover from the stevedore if the stevedore "brought the unseaworthiness of the vessel into play." Crumady v. "Joachim Hendrik Fisser," 358 U.S. 423, 429, 79 S.Ct. 445, 448, 3 L.Ed.2d 413 (1959). The stevedore's warranty also includes the use of equipment incidental to the handling of cargo. Weyerhaeuser Steamship Co. v. Nacirema Operating Company, 355 U.S. 563, 567, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958). Should a substandard performance by the stevedore with this equipment lead to foreseeable liability, the ship owner may recover indemnity. Id.
 
 
 33
 Vantage contends that had the stevedore made a proper inspection of the upper 'tween deck before sending its men down to remove the hatch boards, it would have discovered the defect which resulted in the accident. Vantage challenges the district court's finding that a proper inspection was made on the ground that the district court's finding was based on the use of an improper test, i. e., that the stevedore is required only to make a "cursory inspection." It is Vantage's position that the proper standard is a "reasonable inspection."We find Vantage's argument unpersuasive. It is clear from the district court's opinion that under either test-cursory inspection or reasonable inspection-its findings would have been the same. There was ample evidence from which the district court could conclude that there was no visible defect in the hatch boards.[15] The testimony of the three persons who examined the upper 'tween deck prior to the accident was that the hatch boards appeared in proper order and that there was no visible space between the board and the flange.[16] To rebut this testimony, Vantage offered the testimony of an expert witness who testified that since the hatch board did not break, but slipped between the beams, there must have been a space between the board and the flange which would have been visible and which would have indicated a dangerous condition. While this analysis appears to be perfectly logical, the trier of fact was free to reject this explanation of the accident in favor of the testimony of those persons who actually observed the boards.[17] Since there was evidence from which the trier of fact could find that the defect was not visible, we are bound by the clearly erroneous doctrine and must affirm his finding that the stevedore did not breach its warranty by failing to find and correct a visible defect in the ship.
 
 
 34
 Upon removing the hatch cover, the stevedore observed that the hatch boards in the forward end of the upper 'tween deck were in disarray-some were missing and some were too short. Relying on the testimony of its expert witness, Rykbos, Vantage argues that the stevedore was required to make a more detailed inspection because of the hazardous condition existing in the forward end of the deck. Rykbos testified that the condition in the forward end of the upper 'tween deck might have indicated a bowed beam. A bowed beam may appear straight when the hatch boards are on since the boards exert a pressure to straighten the beam; but, if so, the removal of a hatch board on one side may cause the beam to spring back to its bowed position. Rykbos explained that if a beam was bowed forward and one of the hatch boards was removed, the beam could return to its bowed position, and would widen the space between it and the beam to the aft, causing the hatch boards to slip between the two beams.
 
 
 35
 The district court rejected Rykbos' explanation of the accident, and we believe properly so. Assuming, as did Rykbos, that the beam immediately forward of where Greene fell was bowed forward, the removal of a board to the aft of that beam would not cause it to spring back to a forward bowed position. A beam bowed forward is kept straight by the hatch boards on its forward side. Only the removal of a board to the forward of such a beam would permit it to return to a forward bowed position. And, assuming that the beam was bowed to the aft, the removal of a hatch board by the decedent would have caused the beam to bow to the aft which would have narrowed, not widened, the space between it and the beam to the aft. Because Vantage failed to explain how the condition in the forward end of the upper 'tween deck affected the aft end, or how a more thorough inspection would have uncovered the defect responsible for the accident, we think the district court was correct in denying Vantage's action for indemnity on this theory.
 
 
 36
 Nor do we see any merit in Vantage's argument that the stevedore was required to make a more thorough inspection because of the knowledge acquired through the joint survey conducted in New Jersey.[18] That survey revealed that some of the hatch boards were broken, one beam was bowed, and two beams had their underside flanges toed up. We note first that there is no evidence that the defects found in New Jersey still existed when the ship reached Norfolk. Indeed, the evidence indicated that there were no broken hatch boards at the time of the accident, suggesting that the other defects which were originally noted had been eliminated prior to the vessel's arrival in Norfolk. Furthermore, there is no evidence that either a bowed beam or a beam with its underside flange toed up was the cause of the accident. Hence, even if we assume that the stevedore failed to make a proper inspection to determine whether these defects still existed, there is nothing to suggest that this failure was the proximate cause of the accident.
 
 
 37
 Finally, Vantage argues that the stevedore breached its warranty by failing to comply with the applicable longshoring regulations. 29 C.F.R. Sec. 1504.1 prohibits longshoremen from working in those sections of the hatch containing "missing, broken, split, or poorly fitting hatch covers, or in adjacent sections." Vantage contends that there were only six rows of hatch boards, that rows four and five from the aft end were in disarray, and that the decedent was working on the third row from the aft end when he fell. This would have put him on the row immediately adjacent to one of the rows which was in disarray, thus violating the regulation.
 
 
 38
 A violation of a longshoring regulation may render a vessel unseaworthy "and if such unseaworthiness was the proximate cause of the . . . injury, it would . . . render the defendant shipowner liable." Provenza v. American Export Lines, Inc., 324 F.2d 660, 665 (4 Cir. 1963) cert. denied 376 U.S. 956, 84 S.Ct. 970, 11 L.Ed.2d 971 (1964); Venable v. A/S Det Forenede Dampskibsselskab, 399 F.2d 347, 353 (4 Cir. 1968). However, if the stevedore is responsible for the violation of the regulation, the ship owner is entitled to indemnity from the stevedore. Frasca v. S/S SAFINS E. ISMAIL, supra; Provenza v. American Export Lines, Inc., supra.
 
 
 39
 The district court made no specific findings as to the number of rows of hatch boards; nor did it make any finding as to which rows were in disarray. Our reading of the record indicates that there were probably six rows of hatch boards and the fourth and fifth rows from the aft (or the second and third rows from the forward) end were probably the ones in disarray. If we are correct, then when the decedent was working on the third row of hatch boards, he was immediately adjacent to one of the rows which was in disarray in violation of 29 C.F.R. Sec. 1504.31; and if the violation of this regulation by the stevedore was the proximate cause of the accident, the ship owner is entitled to indemnity from the stevedore.[19] We, therefore, vacate the judgment in the third party action and remand it for further findings on the present record, supplemented, in the discretion of the district court, with additional relevant evidence which may be tendered.
 
 
 40
 The judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
 
 
 41
 Affirmed in part; reversed in part; and remanded.
 
 
 
 [1]
 The Military Sealift Command (MSC) provides shipping services for the Department of Defense. When a ship is chartered by MSC, that agency informs the Army's Military Terminals Management Transportation Service (MTMTS) of the availability of ship space. MTMTS then informs the Department of Defense of the space available
 
 
 [2]
 The purpose of the survey was to record the condition of the vessel to insure that it would be returned in the same condition as received. Copies of the survey are not ordinarily distributed to other government agencies
 
 
 [3]
 In an early case, Hamburg-American Steam Packet Co. v. Baker, 185 F. 70 (4 Cir. 1911), this circuit recognized the necessity of providing safe hatch covers:
 It is well known that in order to handle the hatch covers the men must go upon the hatch, and therefore they must be made safe to bear that weight and to hold their position under that strain, and if they are not and that is a permanent condition of the hatch of the ship, it is the fault of the ship.
 Id. at 72. See also Samad v. The Etivebank, 134 F.Supp. 530 (E.D.Va.1955).
 
 
 [4]
 Vantage presented an expert witness who testified that if the board slipped between two hatch beams, there must have been some visible space between the board and the flange of the hatch beam, indicating an unsafe condition. This evidence, however, was submitted only in reference to the indemnity action
 
 
 [5]
 Prior to Moragne, an action for wrongful death occurring within territorial waters could be brought pursuant to state wrongful death statutes. Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210 (1921). Where an action was brought pursuant to a state statute, it was first necessary to determine whether that statute included the substantive maritime principles of negligence and unseaworthiness. If it did, then a plaintiff could recover according to the same general maritime principles which applied to non-fatal maritime injuries and to deaths occurring on the high seas. See Mitchell v. Trawler Racer, supra; Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944). However, if the state statute limited its standards for recovery to those principles applied in non-maritime cases, the plaintiff was denied the benefit of substantive maritime principles, despite the fact that the latter would have been applicable had death occurred on the high seas or had the injury been non-fatal. See The Tungus v. Skovgaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959)
 The difficulty with this approach to wrongful deaths occurring on territorial waters was clear. First, since most state courts had not interpreted their wrongful death statues in the context of substantive maritime law, the federal courts were often left to "divine" how the state court would interpret its wrongful death statute. The Tungus v. Skovgaard, supra, 358 U.S. at 600, 79 S.Ct. 503 (Brennan, J. concurring in part and dissenting in part). Furthermore, the basis of liability differed according to the state in which the death occurred. Finally, in those states in which the wrongful death statutes did not encompass substantive maritime principles, the duty owed by the ship owner varied depending on whether the injury was fatal or non-fatal. Id. at 611, 79 S.Ct. 503. It was within this framework that the Court decided Moragne: "Our recognition of a right to recover for wrongful death under general maritime law will assure uniform vindication of federal policies, removing the tensions and discrepancies that have resulted from the necessity to accommodate state remedial statutes to exclusively maritime substantive concepts." Moragne v. States Marine Lines, Inc., supra, 398 U.S. at 401, 90 S.Ct. at 1788.
 
 
 [6]
 See note 5 supra
 
 
 [7]
 This is not to suggest, however, that uniformity as a matter of public policy, might not dictate that the measure of damages for this new cause of action follows those provided in analogous statutory actions
 
 
 [8]
 While noting that the doctrine had been the object of considerable criticism and numerous exceptions, the Court, nonetheless, reaffirmed it in Kossick v. United Fruit Co., 365 U.S. 731, 738-739, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). Prior to Moragne, the most notable exception to the rule was that which permitted "state wrongful death statutes . . . and state survival of action statutes . . . to grant and to preserve a cause of action based ultimately on a wrong committed within the admiralty jurisdiction and defined by admiralty law . . ." Id. at 739, 81 S.Ct. at 892
 
 
 [9]
 Additionally, recovery can be had for a decedent's pain and suffering under the National Parks Act, 16 U.S.C.A. Sec. 457 and the Outer Continental Shelf Lands Act, 43 U.S.C.A. Secs. 1331-1343, both of which adopt the state statutes applicable to the particular area in which the federal reservation is located. Clearly, there is no federal policy against awarding damages for pain and suffering
 
 
 [10]
 See Prosser, Law of Torts Sec. 120 (3rd ed. 1964)
 
 
 [11]
 There is substantial authority that a plaintiff may join a cause of action under a state survival statute with a cause of action under the DOHSA. E.g. Dugas v. National Aircraft, 438 F.2d 1386 (3 Cir. 1971); United States v. S.S. Washington, 172 F.Supp. 905 (E.D.Va.) aff'd sub. nom. United States v. Texas Co., 272 F. 2d 711 (4 Cir. 1959). In this way a plaintiff can recover for his pecuniary loss vis-a-vis the DOHSA and for the decedent's pain and suffering under the state survival statute. Presumably if a person can join a state survival action with a cause of action under the DOHSA, he can also join that state action with the new Moragne action
 
 
 [12]
 For example, Virginia does not provide for recovery of the decedent's pain and suffering. See Breeding, Adm'r v. Johnson, 208 Va. 652, 159 S.E.2d 836 (1968)
 
 
 [13]
 See S.Rep.No.216, 66th Cong., 1st Sess. 3 (1920); H.R.Rep.No.674, 66th Cong., 1st Sess. 3 (1920); 59 Cong.Rec. 4482-4486
 
 
 [14]
 Virginia is one of the jurisdictions which permits recovery for grief and mental anguish. Anderson v. Hygeia Hotel Co., 92 Va. 687, 24 S.E. 269 (1896)
 
 
 [15]
 The cases uniformly hold that a stevedore is not responsible for latent defects. Victory Carriers, Inc. v. Stockton Stevedoring Co., 388 F.2d 955, 959 (9 Cir. 1958); D/S OVE SKOU v. Hebert, 365 F.2d 341, 348 (5 Cir. 1966); Ray v. Compania Naviera Continental, S.A., 203 F. Supp. 206, 211 (D.Md.1962); see also Frasca v. S/S SAFINA E. ISMAIL, 413 F.2d 259, 261 (4 Cir. 1969)
 
 
 [16]
 A space between the hatch board and the flange of the beam might indicate that the board was too short and thus capable of falling between the hatch beams
 
 
 [17]
 "Accidents do happen that simply cannot occur. * * * Ships still collide, although at the moment of impact, each is going full astern through the water." D/S OVE SKOU v. Hebert, supra, 365 F.2d at 346 (Brown, J.)
 
 
 [18]
 For the purpose of this opinion, we will assume that the stevedore had knowledge, or should have had knowledge, of the contents of the joint survey
 
 
 [19]
 It should be noted that Vantage's factual contention, if accepted, would place decedent "immediately adjacent" to one of the rows in disarray. The regulation requires only that a longshoreman not work in those sections of the hatch "adjacent" to a row in disarray. We do not now decide that only disarranged hatch boards "immediately adjacent," i. e., contiguous or touching, constitute a violation of the regulation. What constitutes an "adjacent section" is a matter for determination by the district court in the first instance on the facts of a particular case