## Richmond

### Patricia Ann Brown

#### v.

### Kay J. Brown, Administratrix, Etc., et al.

December 2, 1983.

Record No. 810525.

Present: All the Justices.

*S. Miles Dumville (James A. Howard; Thomas & Sewell, P.C.; Breeden, Howard & MacMillan,* on briefs), for appellant.

*Alan P. Owens (Anthony J. Montagna, Jr.; Wiley G. Gary; Smith and Owens,* on briefs), for appellees.

CARRICO, C.J., delivered the opinion of the Court.

This appeal involves the death of a shipyard worker on the navigable waters of the Commonwealth and presents a choice-of-law question with respect to the distribution of a fund paid in settlement of a wrongful death claim. Finding that the trial court erred in applying admiralty law to include the unadopted stepson of the decedent among the distributees of the fund, we reverse.

Edward Carol Brown (Brown) was killed on March 17, 1975, when a tank barge owned by Allied Towing Corporation (Allied)

exploded and burned as it lay alongside Allied's dock on the Elizabeth River in Norfolk. Brown, a shipyard employee of Allied, was engaged in repairing the barge when it exploded.

On April 10, 1975, pursuant to 46 U.S.C. §§ 181, *et seq.*, Allied filed in the United States District Court for the Eastern District of Virginia a petition seeking the maritime remedy of exoneration from, or limitation of, liability in connection with the explosion and fire. Kay J. Brown, the widow of Brown and the administratrix of his estate (Kay), filed in the limitation proceeding a claim for his death, and she and other claimants were enjoined from prosecuting claims except in that proceeding.

On March 9, 1976, the District Court denied Allied's petition, *Complaint of Allied Towing Corp.*, 409 F. Supp. 180 (E.D. Va. 1976), and, on August 2, 1976, dissolved the restraining order, thus permitting the claimants to proceed in the forum of their choice, *Complaint of Allied Towing Corp.*, 416 F. Supp. 1207 (E.D. Va. 1976). These actions of the District Court were subsequently affirmed on appeal. *Allied Towing Corp.* v. *Tatem*, 580 F.2d 702 (4th Cir. 1978).

On November 24, 1976, Kay filed in the Circuit Court of the City of Norfolk a motion for judgment against Allied seeking $1,800,000 in damages and alleging that Brown "met his death as a direct and proximate result of [Allied's] negligence." The motion also alleged that "[t]his Claim is governed by the General Maritime Law of the United States."

On February 11, 1977, believing that a jury was permitted in a federal court admiralty action, Kay filed in United States District Court a civil action for Brown's death. When that court denied her request for a jury trial, Kay sought and obtained leave to dismiss her federal action "to enable [her] to prosecute her claim in the State Court where she may have trial by jury."

Kay returned to the Circuit Court of the City of Norfolk to prosecute the action pending there. The case went to trial before a jury on June 18, 1980, but during the trial, the parties settled the matter. Pursuant to the terms of the settlement, Allied paid the sum of $400,000 into court for distribution among those found entitled to share in the fund.

Thereafter, the trial court conducted a hearing to determine the distribution of approximately $265,000 remaining in the fund after payment of counsel fees and costs. The evidence at the hearing showed that, in addition to Kay, Brown was survived by their son,

Ronnie, born December 15, 1968, and Brown's daughter by a previous marriage, Patricia, born July 9, 1962. Kay also had a child by a previous marriage, Timothy Hoggard, born December 4, 1964. Timothy's natural father died in 1965, and Timothy had lived with his mother and stepfather ever since their marriage in 1966. Yet, although Brown partially supported Timothy and treated him as his own son, he never adopted the boy.

Brown and his first wife were divorced when Patricia was four years old. The mother was granted custody, and Brown was ordered to pay $7.50 per week for child support. Brown terminated these payments sometime in 1967 because he could not afford to continue them; apparently, no effort was made thereafter to enforce the payments. Patricia, who lived in North Carolina, saw her father approximately twice a year and occasionally talked with him on the telephone.

After the hearing, the trial court held in a written opinion that admiralty law applied and that, as a result, Timothy was entitled to participate in the distribution of the net proceeds of the fund. Using a formula taking into account several factors, the court apportioned $173,510.75 to Kay, $53,000 to Ronnie, $31,340 to Timothy, and $7,000 to Patricia. From the final order directing distribution in this manner, Patricia has appealed.

Patricia contends that the trial court erred in applying admiralty law and distributing a portion of the fund to Timothy. She argues that, despite the allegation in Kay's motion for judgment stating "[t]his Claim is governed by the General Maritime Law," the cause of action asserted by Kay is essentially one under Virginia's Death by Wrongful Act statute, Code §§ 8.01-50 to -56, and the distributees of the fund should be determined by resort to § 8.01-53. Under this section as it read at the time Brown was killed, damages awarded for a wrongful death were distributed to "the surviving spouse, children, and grandchildren of the deceased."[1] Patricia maintains that, although Virginia has not decided the point, the states which have considered the question are unanimous in holding that the term "children," as used in wrongful death statutes similar to Virginia's, does not include unadopted stepchildren.

---

[1] A 1979 amendment changed this language to "the surviving spouse, children of the deceased and children of any deceased child of the deceased." Acts 1979, ch. 356.

Kay, Ronnie, and Timothy (collectively, Kay) contend, on the other hand, that the trial court properly applied admiralty law and correctly held Timothy was entitled to share in the distribution of the fund. Kay submits that, pursuant to the maritime decision in *Petition of United States*, 418 F.2d 264 (1st Cir. 1969), a dependent stepchild, although unadopted, is entitled to share in an award for a stepparent's wrongful death.

Kay insists that "[i]t is beyond question that federal substantive law . . . grants both the remedy and identifies the beneficiaries in a maritime wrongful death claim." Quoting *Jansson* v. *Swedish American Line*, 185 F.2d 212, 216 (1st Cir. 1950), Kay states that when an action is brought in a state court upon a claim cognizable in admiralty, "the substantive law to be applied is the same as would be applied by an admiralty court—that is, the general maritime law, as developed and declared . . . by the Supreme Court of the United States." And, Kay points out that the Supreme Court in *Moragne* v. *States Marine Lines*, 398 U.S. 375 (1970), said that a state trial court is "bound to apply federal maritime law in a case within federal admiralty jurisdiction." *Id.* at 378 n.1.

■ The determinative question becomes, therefore, whether the cause of action asserted by Kay is "a case within federal admiralty jurisdiction." Alleging in a pleading, as Kay alleged here, that a case "is governed by the General Maritime Law" does not necessarily make a cause of action one "within federal admiralty jurisdiction." Admiralty law itself determines what cases come within admiralty jurisdiction. We believe that the question in this appeal is answered by the Supreme Court's maritime decision in *Moragne*.

The trial court cited *Moragne* as support for its holding that admiralty law applied and required inclusion of Timothy as a distributee of the fund; Kay relies heavily upon the case here. *Moragne* involved a longshoreman who was killed while working aboard a vessel on navigable waters within the state of Florida. His personal representative brought an action in a Florida state court against States Marine Lines, the vessel's owner, alleging both negligence and unseaworthiness as bases for recovery of damages.

States Marine removed the case to federal court on the ground of diversity of citizenship. In District Court, States Marine moved to dismiss the portion of the claim based upon unseaworthiness,

asserting that maritime law provided no remedy for wrongful death within a state's territorial waters and that Florida's wrongful death statute did not encompass unseaworthiness as a basis of liability. The District Court dismissed the challenged portion of the complaint, and the personal representative appealed the dismissal to the Court of Appeals for the Fifth Circuit.

Taking advantage of a Florida statute, the Court of Appeals certified to the Florida Supreme Court the question whether that state's wrongful death statute "allowed recovery for unseaworthiness as that concept is understood in maritime law." 398 U.S. at 377. The Florida court answered the question in the negative. When the case returned to the Court of Appeals, that court affirmed the District Court's order, thus "rejecting [the personal representative's] argument that she was entitled to reversal under federal maritime law without regard to the scope of the state statute." *Id.*

When the case reached the Supreme Court, the Court stated that it had granted certiorari "to consider whether *The Harrisburg*, 119 U.S. 199, in which [the] Court held in 1886 that maritime law does not afford a cause of action for wrongful death, should any longer be regarded as acceptable law." 398 U.S. at 375-76. The Court reversed, holding that "an action does lie under general maritime law for death caused by violation of maritime duties." *Id.* at 409. In taking this action, the Court overruled *The Harrisburg*. The Court explained that, in previously denying recovery for wrongful death, admiralty merely followed the common law rule that " 'no civil action lies for an injury which results in . . . death,' " 398 U.S. at 380; this ancient rule was based upon the precept that "a personal cause of action in tort did not survive the death of its possessor." *Id.* at 385.

The Court noted that, over the years, the common law rule had been abandoned. This abandonment was exemplified, the Court said, by such actions as the adoption of Lord Campbell's Act in England, the enactment of wrongful death statutes in every state in this country, and the creation by Congress of causes of action for wrongful death in several specific areas. *Id.* at 389-90.

The Court noted further that, from the date of *The Harrisburg* until 1920, there was no remedy for death on the high seas under federal maritime law and no recovery for death within state territorial waters except when permitted by applicable state statutes. *Id.* at 393. The Court then observed that, in 1920, Congress

passed two landmark statutes to provide a remedy in two specific circumstances. The first, the Death on the High Seas Act, 46 U.S.C. §§ 761, *et seq.*, permitted recovery for "the death of a person" occurring "beyond a marine league [three miles] from the shore of any State" as a result of "wrongful act, neglect, or default." The second, the Jones Act, 46 U.S.C. § 688, created a cause of action for the death of seamen occurring in the course of employment as a result of negligence. This Act applied to death occurring both in state territorial waters and on the high seas. 398 U.S. at 394.

At this pre-*Moragne* stage in the development of admiralty law, a federal cause of action existed for the wrongful death on the high seas of both seamen and non-seamen resulting from either unseaworthiness or negligence. Death on the High Seas Act, 46 U.S.C. §§ 761, *et seq.* A federal cause of action also existed for the wrongful death of seamen either on the high seas or in state territorial waters, but only for negligence. Jones Act, 46 U.S.C. § 688. There was no federal cause of action, however, for the wrongful death of non-seamen in state territorial waters for either unseaworthiness or negligence, and there was no federal cause of action for wrongful death in state territorial waters for unseaworthiness.

It was into this breach that the Court stepped in *Moragne*. The Court stated that the "efficiency in adjudication" which would result from supplanting "the present disarray in this area with a rule both simpler and more just," 398 U.S. at 405, justified overruling *The Harrisburg.* The Court announced "a new remedial rule to effectuate well-established primary rules of behavior." *Id.* at 403. The new rule, the Court stated, would recognize "the established expectations of both those who own ships and those who work on them . . . that there is a duty to make the ship seaworthy and that a breach of that federally imposed duty will generally provide a basis for recovery." *Id.* at 404.

We believe it is clear from the history of *Moragne* en route to the Supreme Court, and from the treatment it received on arrival there, that, as the Eleventh Circuit Court of Appeals stated in *Ford* v. *Wooten*, 681 F.2d 712, 717 (11th Cir. 1982), *cert. denied*, 459 U.S. 1202 (1983), "the *Moragne* remedy applies only to unseaworthiness."[2] And, as the Fifth Circuit said in *Ivy* v. *Security*

---

[2] *Ford* v. *Wooten* was decided subsequent to the trial court's decision in the instant case.

*Barge Lines, Inc.*, 606 F.2d 524, 527 (5th Cir. 1979) (en banc), *cert. denied*, 446 U.S. 956 (1980), "*Moragne* did not create or even discuss an action for negligence; it dealt only with death occasioned by unseaworthiness."

"Unseaworthiness" is a term of art in the field of admiralty law. The obligation of a ship owner to provide a seaworthy vessel is an absolute duty not satisfied by the exercise of due diligence. *Moragne*, 398 U.S. at 399. An allegation of negligence, . therefore, is not tantamount to an allegation of unseaworthiness.

Yet, there is not one word in Kay's motion for judgment suggesting that she asserts a federal cause of action based upon the unseaworthiness of the vessel upon which Brown met his death. The motion alleges negligence only, and, as indicated, even after *Moragne*, there is no federal cause of action for the death of nonseamen in state territorial waters occasioned by negligence;[3] therefore, Kay's cause of action is cognizable only under Virginia law, and she cannot rely upon admiralty law to establish Timothy as a distributee of the fund.

This leaves only Kay's contention that we should hold "a dependent stepson . . . a proper beneficiary under Virginia law." As noted earlier, pertinent here is the portion of Code § 8.01-53 which previously provided for distribution of a death award to "the surviving spouse, children, and grandchildren *of the deceased*" (emphasis added).

Kay cites our decision in *Carroll* v. *Sneed*, 211 Va. 640, 179 S.E.2d 620 (1971). There, we held that a dependent illegitimate child is a proper distributee under our Death by Wrongful Act statute. In the course of our opinion, we observed that " 'children are such, no matter what their origin.' " *Id.* at 643, 179 S.E.2d at 622. It does not follow, however, that stepchildren, whose origins are not *of the deceased*, qualify for distribution the same as illegitimate children. Instead, we adopt the majority rule that the term "children," as used in death-by-wrongful-act provisions similar to Virginia's statute, does not include unadopted stepchildren. *E.g., Jones* v. *Jones*, 270 Or. 869, 530 P.2d 34 (1974); *Klossner* v. *San Juan County*, 93 Wash. 2d 42, 605 P.2d 330 (1980).

Because the trial court apportioned the fund on the incorrect assumption that Timothy was entitled to share in the distribution,

---

[3] This case does not come under the Jones Act because Brown was not a seaman.

we will reverse the judgment appealed from and remand the case for further proceedings not inconsistent with the views expressed in this opinion.

*Reversed and remanded.*